T. W. ROSE v. VULCAN MATERIALS COMPANY

No. 41

(Filed 14 February 1973)

1. Contracts § 6— illegality — affirmative defense — burden of proof
   Illegality is an affirmative defense, and the burden of proving illegality is on the party who pleads it. G.S. 1A-1, Rule 8(c).

Rose v. Materials Co.

2. **Contracts § 7; Monopolies § 2— contract providing for price discrimination — intrastate sales — Robinson-Patman Act**

A contract providing that defendant would sell stone from a certain quarry to plaintiff at specified prices and would not sell such stone to anyone other than the State Highway Commission for less than specified higher prices did not violate the Robinson-Patman Act, 15 U.S.C. § 13(a), where the evidence showed that although the price discriminator was engaged in interstate commerce, all of the sales under the contract were wholly intrastate.

3. **Contracts § 7; Monopolies § 2— price discrimination in favor of buyer — no violation of state law**

The purpose of G.S. 75-5(b)(5) is to prevent a seller with several distribution points from predatorily lowering his prices in one locality where he has competition, while maintaining his prices at another locality in order to continue to generate an acceptable overall profit margin, thereby destroying his competitor in the low priced locality, the statute not being intended to outlaw price discrimination in the secondary line of competition between the buyer and his competitors; consequently, a contract creating a price discrimination in favor of a buyer of stone does not violate the statute.

4. **Contracts § 7; Monopolies § 2— contract establishing price discrimination — restraint of trade — reasonableness**

A contract establishing a price discrimination is not illegal *per se* under G.S. 75-1 but must be shown to be *unreasonably* in restraint of trade in order to violate that statute; and such a contract cannot be said to be unreasonably in restraint of trade without evidence of facts peculiar to the business to which the restraint is applied, its condition before and after the restraint was imposed, and the nature of the restraint and its actual or probable effect.

5. **Contracts § 7; Monopolies § 2— contracts in restraint of trade — rule of reasonableness — burden of proof**

Agreements constituting restraints of trade at early common law are *prima facie* illegal and must be shown to be reasonable by the party seeking to enforce them; other business practices not within the scope of the original common law rule but alleged to be in restraint of trade on the ground that they are "unreasonable restrictions on competition" are not *prima facie* illegal but must be shown to be unreasonable by the one asserting their illegality.

6. **Contracts § 7; Monopolies § 2— illegal price fixing — severability of contract**

Even if the portion of a contract purporting to fix the minimum price at which customers other than plaintiff could buy stone is illegal price fixing under G.S. 75-1 and G.S. 75-5(b)(7), the invalidity of such portion would not affect the validity of those provisions of the contract establishing the price at which plaintiff could buy stone since those provisions are severable from the arguably illegal provision and are in no way dependent upon the arguably illegal provision for their validity.

Rose v. Materials Co.

7. **Assignments § 4; Contracts § 14— general assignment of executory contract — implied promise to perform contract — other party as third-party beneficiary**

  The assignee under a general assignment of an executory bilateral contract becomes the delegatee of his assignor's duties and impliedly promises his assignor that he will perform such duties in the absence of circumstances showing a contrary intention, and the other party to the original contract may sue the assignee as a third-party beneficiary of his promise of performance which he impliedly makes to his assignor by accepting the general assignment.

8. **Assignments § 4; Contracts § 14; Limitation of Actions § 4— assignment of sealed contract — action against assignee — statute of limitations**

  When defendant accepted a general assignment of all assets and obligations of a corporation, it impliedly promised to perform the assignor's duties under a sealed contract to sell stone to plaintiff for a ten-year period at specified prices and became liable to plaintiff for refusal to sell stone at the contract price by reason of that implied promise, not by reason of defendant's unsealed promise by letter to "assume" the obligations of the contract; and since the assignor could not confer upon defendant assignee any greater immunity to suit than the assignor possessed, plaintiff's suit to recover overpayments made to defendant for stone was governed by the ten-year statute of limitations relating to sealed contracts, G.S. 1-47, not the three-year statute of limitations relating to unsealed agreements, G.S. 1-52.

9. **Contracts §§ 21, 23— breach of contract by seller — payment of higher price by buyer — waiver of breach — economic duress**

  When a seller refuses to perform his contract at the agreed price and demands a higher price, the buyer who proceeds to buy at such higher price may recover damages for breach of the contract if he can establish that he acted under economic duress.

10. **Contracts § 23— breach of contract by seller — payment of higher price by buyer — waiver of breach — economic duress**

  After defendant refused to sell stone to plaintiff for use in his ready-mix concrete business at the price specified in their ten-year contract, plaintiff's purchases of stone from defendant at the increased price resulted from economic duress and did not constitute a waiver of the breach where there was no other practical source of stone available to plaintiff during the contract period, plaintiff's only alternatives were to purchase from defendant or go out of business, and plaintiff had no immediate and adequate remedy in the courts which would have enabled him to resist defendant's demands.

11. **Contracts § 29— successive breaches — measure of damages — burden of proving expenses saved**

  Plaintiff was entitled to recover the general measure of damages for successive breaches of a contract giving plaintiff the right to purchase stone from defendant at a specified price during a ten-year period—the aggregate of the differences between the market price charged defendant and the contract price—where plaintiff offered evidence from which the difference between those two figures could

be ascertained, and defendant failed to carry its burden of proving that sales of stone to plaintiff f.o.b. the Elkin quarry, rather than f.o.b. the Cycle quarry as provided in the contract, saved defendant hauling expenses and thus reduced the damages resulting from defendant's breaches of the contract.

12. **Frauds, Statute of § 2; Corporations § 25— corporation's contract signed by president individually — statute of frauds — ratification**

A contract signed by J. E. Dooley individually rather than J. E. Dooley and Son, Inc., the party sought to be charged, meets the requirements of the statute of frauds where the signer was president of the corporation and therefore its general agent, the signer testified he signed the contract in behalf of the corporation, and the instrument itself named the corporation as one of the parties to the agreement; furthermore, the corporation ratified the contract by honoring the contract and accepting the benefits thereunder without objection.

13. **Interest § 2; Contracts § 29— interest on damages for breach of contract — sufficiency of judgment**

In an action to recover damages for successive breaches of a contract to sell stone to plaintiff at a certain price, judgment that plaintiff recover a specified sum "with interest at six percent per annum on each overpayment from the time it was made" is not void for indefiniteness where the dates of the overpayments are easily ascertainable from relevant evidence in the case and all that remains to be done is simply a matter of mathematical calculation.

PLAINTIFF appeals from decision of the Court of Appeals, 15 N.C. App. 695, 190 S.E. 2d 719, reversing judgment of *Long, J.,* 1 November 1971 Session, FORSYTH Superior Court. This case was docketed and argued at the Fall Term 1972 as No. 68.

Plaintiff instituted this action on 28 January 1971 to recover damages for breach of contract. The case was heard by Judge Long without a jury. Facts found by him which are pertinent to the case are narrated in the following numbered paragraphs:

1. Plaintiff T. W. Rose is a resident of Yadkin County. For some time prior to 1 January 1959 he owned and operated a stone quarry in Yadkin County, North Carolina, about three miles from Jonesville. In Jonesville, he owned and operated the only ready-mix cement business in Yadkin County and used stone from his quarry in that business. He also sold crushed stone to others including the North Carolina State Highway Commission.

2. J. E. Dooley was also in the rock-crushing business in Yadkin County in competition with plaintiff. He operated under

the name of J. E. Dooley and Son, Inc., as well as J. E. Dooley, individually. Late in 1958, Mr. Dooley sought to acquire plaintiff's rock-crushing business; and on 1 January 1959, plaintiff entered into two agreements, Exhibits A and B, with J. E. Dooley, acting for himself individually and on behalf of J. E. Dooley and Son, Inc.

3. By the terms of Exhibit A, plaintiff leased his sixteen-acre quarry in Yadkin County to J. E. Dooley and Son, Inc., for a period of ten years beginning 1 January 1959, and the lessee agreed to pay a royalty of two cents per ton for each ton of stone or rock mined and sold from the leased premises. Exhibit A did not *require* the lessee to operate the quarry, but provided:

"Should the tenant decide to operate in the above mentioned quarry he agrees to sell stone to [plaintiff] F.O.B. this quarry for the following prices:

Crushed run stone at $1.45 per ton
Clean Concrete stone at $1.80 per ton
No. 11 stone at $2.20 per ton

The tenant further agrees that he will not sell any stone produced at this quarry to anyone other than the Highway Commission for a price less than the following:

Crushed Run stone at $1.70 per ton
Clean Concrete stone at $2.00 per ton
#11 stone at 2.20 per ton

This contract shall continue and be binding on both parties until the 1st day of January 1969.

T. W. ROSE (SEAL)
J. E. DOOLEY (SEAL)"

4. Simultaneously with the execution of the lease agreement (Exhibit A), and as a part of the total agreement between the parties, they entered into a contract designated as Exhibit B which reads as follows:

"This contract and agreement made and entered into this the 1st day of January, 1959 by and between T. W. Rose of Yadkin County, hereinafter called the buyer and J. E. Dooley and Son, Inc., of Iredell County, hereinafter called the seller.

Witnesseth, that the seller agrees to furnish the buyer stone F.O.B. the quarry site at Cycle, North Carolina at the following prices:

Crusher run stone at $1.25 per ton
Clean Concrete stone at 1.60 per ton
No. 11 stone at 2.00 per ton

It is mutually agreed that the seller of this stone will keep someone at Cycle, North Carolina at least five days a week to weigh and load the stone the buyer should need.

The buyer further agrees that he will not engage in the rock crushing business nor will he permit anyone to engage in the rock crushing business in his quarry site in Yadkin County known as the Yadkin Granite Quarry, except J. E. Dooley and Son, Inc., or the Stone Mining Company.

J. E. Dooley & Son, Inc., agree that they will not sell any stone to anyone other than the State Highway Commission for prices less than the following from the Cycle Quarry:

Crusher run stone            $1.50  per  ton
Clean Concrete stone          1.80  per  ton
No. 11 stone                  2.00  per  ton

The above restrictions shall apply only to an area of an eight mile radius of Elkin, North Carolina and shall apply for a period of ten years from the date of this contract.

The buyer agrees that he will pay for the stone purchased on or before the 10th day of each calendar month for all stone purchased in the proceeding [sic] month.

This contract shall be binding on both parties until the 1st day of January 1969.

T. W. ROSE (SEAL)
J. E. DOOLEY (SEAL)"

5. In signing Exhibits A and B, J. E. Dooley signed his name without written indication that he was signing as president of J. E. Dooley and Son, Inc., but it was his intent that both instruments be the act and deed of J. E. Dooley and Son, Inc., as well as J. E. Dooley, individually, when he affixed his signature thereto.

6. Exhibits A and B, together, constituted one entire contract, and each was executed in consideration of the other.

7. Neither J. E. Dooley and Son, Inc., nor J. E. Dooley, individually, ever operated plaintiff's sixteen-acre quarry described in Exhibit A during the period of the lease. Dooley carried on his crushing business at his own quarry at Cycle, and both plaintiff and Dooley complied with the terms of Exhibits A and B from 1 January 1959 to April 1960. Sometime prior to 12 April 1960, Dooley advised plaintiff that he had an offer from Vulcan Materials Company to purchase his quarry operations and requested plaintiff to release him from Exhibits A and B so he could consummate the sale. Plaintiff declined to do so and advised Dooley he would not release him unless Vulcan Materials Company would agree in writing to comply with all of Dooley's obligations under Exhibits A and B.

8. By a contract effective 23 April 1960 (Exhibit F), Vulcan Materials Company, a corporation doing business in interstate commerce in the quarrying and sale of stone and gravel in North Carolina and various other states, purchased the stone quarry operations and the assets and obligations of J. E. Dooley and Son, Inc., Stone Mining Company, and J. E. Dooley, individually. In confirmation thereof, Vulcan wrote plaintiff's Exhibit C on 25 April 1960 as follows:

"Dear Mr. Rose:

This is to advise you that on April 23, 1960, the stone crushing activities of J. E. Dooley & Son, Stone Mining Company and J. E. Dooley were acquired by Vulcan Materials Company.

Mr. Dooley brought to us this morning the contracts between you and his companies, copies of which are attached. This is to advise that Vulcan Materials Company assumes all phases of these contracts and intends to carry out the conditions of these contracts as they are stated.

We trust that this promise on our part will be satisfactory to you and we are looking forward to seeing you in the near future."

9. From 1 January 1959 until April 1960, Dooley made sales of crushed stone to plaintiff at the prices specified in Exhibit B. After the purchase of Dooley's stone crushing operations in April 1960, Vulcan Materials Company continued to

sell stone to plaintiff at the prices specified in Exhibit B until 11 May 1961. During all such times Dooley and Vulcan considered Exhibits A and B as binding on them insofar as the price of stone to the plaintiff was concerned.

10. In early 1961 Vulcan notified plaintiff that it would no longer sell stone to him at the prices set out in Exhibits A and B and would thereafter charge plaintiff the same prices charged all of its other customers for stone. Commencing 11 May 1961, Vulcan raised stone prices to the plaintiff to a level in excess of the prices specified in Exhibits A and B.

11. At the time Vulcan increased the prices of stone to amounts in excess of those specified in Exhibits A and B, plaintiff was engaged in his ready-mix cement business, using large quantities of stone, and had no other practical source of supply. Advising Vulcan that he intended to sue for breach of contract, he continued to purchase stone from Vulcan under protest from about 12 May 1961 through December 1968 and paid for all stone so purchased by the 10th of each month following the month of purchase. The sums shown on Plaintiff's Exhibit D as "amounts overcharged" represent the monthly amounts paid by plaintiff in excess of the contract prices in Exhibit B for specified tonnages of stone from May 1961 through December 1968. The total of these amounts over and above the prices specified in Exhibit B is $25,231.57, and plaintiff seeks to recover said amount in this action. Plaintiff's receipts for all such payments together with invoices for each month are identified as Plaintiff's Exhibit E.

12. After Vulcan assumed control of the quarry at Cycle, North Carolina, which it acquired from Dooley, it operated the quarry for several years and plaintiff purchased stone f.o.b. such quarry, at prices specified in Exhibit B, until 11 May 1961. Plaintiff thereafter purchased stone f.o.b. such quarry at the higher price until sometime prior to 1965, when Vulcan advised plaintiff that it was closing the Cycle quarry and that plaintiff could make further purchases of stone from a quarry operated by defendant near Elkin, North Carolina, referred to in the evidence as "the Elkin quarry." Plaintiff, having no other practical source of stone with which to maintain his cement business, continued thereafter to purchase stone from Vulcan f.o.b. the Elkin quarry and continued to pay prices in excess of those specified in Exhibit B. At the trial of this action, defendant offered evidence with respect to reduced mileage between

plaintiff's ready-mix cement business at Jonesville and the Elkin quarry as compared to the distance to the Cycle quarry.

At the close of all the evidence, Judge Long made extensive findings of fact and, based on such findings, concluded as matters of law: (1) That the contracts, Plaintiff's Exhibits A and B, were valid and binding with respect to the obligation of defendant to furnish stone to plaintiff at the specified prices; (2) that plaintiff at all times complied with the contracts, defendant accepted the full benefits thereof, and the contracts are no longer executory; (3) that defendant breached the contracts; (4) that plaintiff did not waive his rights to recover damages for the breach; (5) that plaintiff has been damaged by defendant's breach of contract in the sum of $25,231.57 and is entitled to recover such amount with interest at six percent per annum on each overpayment from the date it was made; and (6) that this action is not barred by the statute of limitations.

Judgment was accordingly entered in favor of the plaintiff for $25,231.57 with interest at six percent per annum "on each payment made by plaintiff to defendant from the date of each such payment and continuing until paid."

On appeal, the Court of Appeals reversed, holding that the contracts identified as Exhibits A and B were unenforceable because they violated both state and federal antitrust laws, precluding recovery of damages for breach thereof. Judge Britt dissented, and plaintiff appealed to this Court as of right under the provisions of G.S. 7A-30(2). Errors assigned will be noted in the opinion.

*W. F. Maready and James H. Kelly, Jr., Attorneys for plaintiff appellant; of counsel: Hudson, Petree, Stockton, Stockton & Robinson.*

*Womble, Carlyle, Sandridge & Rice by Charles F. Vance, Jr., and John L. W. Garrou, Attorneys for defendant appellee.*

HUSKINS, Justice.

Defendant contends that the contract denominated Exhibit B, entered into by its assignor J. E. Dooley and Son, Inc., providing that J. E. Dooley and Son, Inc., would sell stone f.o.b. the Cycle quarry to plaintiff at certain specified prices and would "not sell any stone to anyone other than the State Highway Commission for prices less than [certain specified higher prices]

from the Cycle quarry" was in violation of both the Robinson-Patman Act, 15 U.S.C. § 13(a) (1971) and State antitrust law and so was unenforceable.

[1] Illegality is an affirmative defense, G.S. 1A-1, Rule 8(c), Rules of Civil Procedure, and the burden of proving illegality is on the party who pleads it. Thus defendant has the laboring oar on this question.

[2] The contract has two distinct features: (1) It establishes the price at which plaintiff may buy stone from defendant, and (2) it fixes another, higher, minimum price at which customers other than plaintiff may purchase stone from defendant. Thus, the contract creates a *price discrimination* in favor of plaintiff. Is the contract illegal under federal or state law, or both, by reason of the price discrimination?

The Robinson-Patman Act reads in relevant part as follows:

> "It shall be unlawful for any person engaged in commerce in the course of such commerce, . . . to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce . . . where the effect of such discrimination may be . . . to injure . . . competition. . . . " 15 U.S.C. § 13(a) (1971).

The words "in commerce" mean in *interstate* commerce. *Borden Co. v. F.T.C.*, 339 F. 2d 953 (7th Cir. 1964).

This Act, as prerequisites to its application, requires a showing not only that the price discriminator is engaged in interstate commerce, but also that in the course of such commerce a discriminatory sale occurred *in* interstate commerce. " . . . [I]t is not enough . . . that the defendant be engaged in interstate commerce but it must also be shown that the sale complained of was one occurring in interstate commerce." *Willard Dairy Corp. v. National Dairy Products Corp.*, 309 F. 2d 943 (6th Cir. 1962). " . . . [A]t least one of the two transactions which, when compared, generate a discrimination must cross a state line." *Hiram Walker, Inc. v. A & S Tropical, Inc.*, 407 F. 2d 4 (7th Cir. 1969), cert. den. 396 U.S. 901, 24 L.Ed. 2d 177, 90 S.Ct. 212 (1969). *See also Abramson v. Colonial Oil Co.*, 390 F. 2d 873 (5th Cir. 1968); Kintner and Mayne, "Interstate Commerce Requirement of the Robinson-Patman Price Discrimination Act," 58 Geo. L. J. 1117 (1970).

Rose v. Materials Co.

In the case before us it was stipulated that "Vulcan Materials Company is a corporation doing business in interstate commerce in the quarry and sales of stone and gravel in North Carolina and various other states." This stipulation establishes only that the price discriminator, Vulcan Materials Company, was *engaged* in interstate commerce. Nothing in the record establishes the essential additional fact that in the course of such commerce one of the alleged discriminatory sales occurred *in* interstate commerce. Indeed, all the evidence shows that these sales were wholly intrastate. Therefore, the Robinson-Patman Act can have no applicability here. Accordingly, the issue of the validity of the contract in question is wholly one of state law.

We now consider the impact of G.S. 75-5(b)(5) on the contract under consideration.

The courts and commentators have developed several shorthand terms describing the various forms that price discrimination may take. The line of competition between the seller (Vulcan) and its competitors is called the "primary line"; that between the buyer (Rose) and his competitors, the "secondary line." When a seller varies his price for a given commodity from one regional market or locality to another, he has engaged in "geographic" or "area" discrimination. *See* Comment, Unlawful Primary Line Price Discriminations: Predatory Intent and Competitive Injury, 68 Colum. L. Rev. 137 (1968).

The record in this case establishes, at best, only price discrimination in the secondary line. The effect of the contract in question was to give plaintiff a favorable price for the stone used in his ready-mix cement business. As a result of that favorable price differential as to that stone, one of the components of his resale product, plaintiff gained a competitive edge of undemonstrated magnitude over his competitors in the ready-mix cement business. On this record, only these competitors, the secondary line of competition, could have been adversely affected by the price differential in question. This is so for the reason that the uncontroverted evidence shows that J. E. Dooley and Son, Inc., had *no* competition from the date of execution of the contract in question until it assigned that contract to Vulcan Materials Company, and that Vulcan Materials Company had no competition from then until 1962. There is some slight evidence, controverted by plaintiff, that after 1962 Vulcan Materials Company had at least one competitor

---

---

"around there operating a quarry," but the trial court found to the contrary. Thus, in this record there is little evidence of even the *existence* of a primary line of competition; there is no evidence at all that the favorable price was given plaintiff for the purpose of injuring competition in the primary line. In addition, there is no evidence of area discrimination on the part of J. E. Dooley and Son, Inc., or Vulcan Materials Company, for nothing in the record shows that either charged a lower price generally at the Cycle quarry than it charged at any other quarry it was operating in a different locality.

Accordingly, the issue presented by this record is quite simply stated: Does price discrimination in the secondary line violate any law of the State of North Carolina?

G.S. 75-5(b)(5) provides:

" . . . [I]t is unlawful for any person directly or indirectly to do, or to have any contract express or knowingly implied to do, any of the following acts:

\*        \*        \*

(5) While engaged in dealing in goods within this State, at a place where there is competition, to sell such goods at a price lower than is charged by such person for the same thing at another place, when there is no good and sufficient reason on account of transportation or the expense of doing business for charging less at the one place than at the other, or to give away such goods, with a view to injuring the business of another."

[3] We think this statute is aimed at *predatory area discrimination in the primary line.* It was not intended to outlaw price discrimination in the secondary line, and no *reasonable* construction of the statute produces that result. Apparently, the purpose of G.S. 75-5(b)(5) is to prevent a seller with several distribution points from predatorily lowering his prices in one locality where he has competition, while maintaining his prices at another locality in order to continue to generate an acceptable overall profit margin, thereby destroying his competitor in the low priced locality. Such practices would be area discrimination in the primary line and are illegal under G.S. 75-5(b)(5). Beyond such practices G.S. 75-5(b)(5) does not reach. The statute simply has no applicability to price discrimination in

the secondary line. Since defendant, having at best made out an inferential case of price discrimination in the secondary line, has not shown the contract in question to be predatory area discrimination in the primary line, his defense based on G.S. 75-5 (b) (5) was improperly sustained by the Court of Appeals.

The California Supreme Court has reached an analogous interpretation of its Business and Professional Code §§ 17031 and 17040, statutes similar to G.S. 75-5 (b) (5). See *Harris v. Capital Records Distributing Corp.*, 64 Cal. 2d 454, 50 Cal. Rptr. 539, 413 P. 2d 139 (1966), quoting Bermingham, "Legal Aspects of Petroleum Marketing under Federal and California Laws," 7 U.C.L.A. L. Rev. 161, 246: " ' . . . [The] act protects only first-line competition against predatory price cutting on an area basis and does not make illegal price discrimination which only injures second or third line competition at the buyer level or lower.' "

[4]   Defendant also argues that the contract in question was illegal under G.S. 75-1, which says: "Every contract . . . in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal. . . . "

This section of our law was based upon section one of the Sherman Act, 15 U.S.C. § 1 (1971), which reads as follows: "Every contract . . . in restraint of trade or commerce among the several States . . . is declared to be illegal. . . . "

There has been little litigation as to the various kinds of contracts that may constitute illegal restraints of trade under G.S. 75-1. However, G.S. 75-2 says that "[a]ny . . . contract . . . in restraint of trade or commerce which violates the principles of the common law is hereby declared to be a violation of § 75-1." Thus, the common law on restraint of trade is determinative of at least the minimum scope of G.S. 75-1. And, the body of law applying the Sherman Act, although not binding upon this Court in applying G.S. 75-1, is nonetheless instructive in determining the full reach of that statute.

Under the common law at a remote period in England, "the term 'contract in restraint of trade' meant an individual's voluntary contractual restraint on his right to carry on his trade or calling." 54 Am. Jur. 2d, Monopolies, Restraints of Trade, and Unfair Trade Practices, § 446. This inhibition against restraints of trade at common law seems at first to have had no

Rose v. Materials Co.

exception. Later, such restraints were void only if unreasonable, the test being " . . . whether the restraint is such only as to afford a fair protection to the interests of the party in favor of whom it is given, and not so large as to interfere with the interests of the public. Whatever restraint is larger than the necessary protection of the party, can be of no benefit to either, it can only be oppressive; . . . it is, in the eye of the law, unreasonable." *Horner v. Graves*, 7 Bing. 735, 131 Eng. Rep. 284 (1831). Later still, the English came to "apply the rule of reason which finally evolved as to technical covenants in restraint of trade to all commercial efforts to suppress competition and to secure market dominion, and unless the particular restraints are such that they are unduly or unreasonably oppressive of either the individual rights of the contracting parties or of the public interest, the contract is upheld as valid." Note, *Monopolies—Price Fixing Agreements and the Sherman Act—Appalachian Coals, Incorporated*, 19 Va. L. Rev. 851, 855 (1933). Thus, the term "restraint of trade" evolved in England to include unreasonable restrictions on competition, despite its original common law limitation to " . . . restraint[s] suffered by the covenantor with respect to his own trade or business by virtue of his voluntary contract. . . . " Note, supra, 19 Va. L. Rev. 851, 853 (1933).

A similar course of development occurred in the United States. "In this country . . . it came . . . to pass that contracts or acts which it was considered had a monopolistic tendency, especially those which were thought to unduly diminish competition and hence to enhance prices—in other words, to monopolize—came also in a general sense to be spoken of and treated as they had been in England, as restricting the due course of trade and therefore as being in restraint of trade." *Standard Oil Co. v. United States*, 221 U.S. 1, 56-57, 55 L.Ed. 619, 31 S.Ct. 502 (1910). Thus, it is apparent that at common law in England, and later in this country, "only combinations or agreements which operate to the prejudice of the public by unduly or unreasonably restricting competition or restraining trade are illegal. . . . The combination is not objectionable if the restraint is such only as to afford fair protection to the parties thereto and not broad enough to interfere with the interest of the public." 58 C.J.S., Monopolies § 16. *See Buick Co. v. Motors Corp.*, 254 N.C. 117, 118 S.E. 2d 559 (1961); *Bradshaw v. Millikin*, 173 N.C. 432, 92 S.E. 161 (1917). This is the so-called "rule of reason."

Rose v. Materials Co.

A similar rule of reason was read into the Sherman Act with respect to certain contracts and practices. *See Chicago Bd. of Trade v. United States,* 246 U.S. 231, 62 L.Ed. 683, 38 S.Ct. 242 (1918); *United States v. American Tobacco Co.,* 221 U.S. 106, 55 L.Ed. 663, 31 S.Ct. 632 (1911); *Standard Oil Co. v. United States, supra.* However, that Act has been interpreted to make certain other contracts and practices illegal *per se* " . . . because they are . . . incapable of any legal or economic justification. They can have no other purpose or effect than that of injuring, suppressing or destroying the competitive process." 1 R. Callman, Unfair Competition Trademarks and Monopolies 336 (3d ed. 1967).

Despite this vast body of common and statutory law dealing with restraints of trade, defendant cites no cases holding that a contract establishing a price discrimination is illegally in restraint of trade for that reason alone. Nor can we discover any such cases. We conclude that price discrimination simply has not been dealt with in terms of "restraint of trade." However, we do not hold that a contract may never constitute an illegal restraint of trade solely because of a price discrimination that it establishes. Instead, we hold that such contracts are not illegal *per se,* and that this contract has not been shown to be *unreasonably* in restraint of trade by reason of the price discrimination that it establishes. The record is devoid of evidence of " . . . facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable." *Chicago Board of Trade v. United States, supra.* Without such evidence the contract cannot be said to be in violation of the rule of reason. Defendant has therefore failed to carry its burden of proving the contract illegally in restraint of trade by reason of the price discrimination that it establishes.

[5] This decision with respect to the burden of proof is not in conflict with our decision in cases such as *Kadis v. Britt,* 224 N.C. 154, 29 S.E. 2d 543 (1944). Such cases deal with what were restraints of trade at early common law—"an individual's voluntary contractual restraint on his right to carry on his trade or calling." Such restraints are *prima facie* illegal and must be shown to be reasonable by the party seeking to enforce them. As to other business practices, not within the scope of the original common law rule but alleged to be in restraint of trade on the ground that they are "unreasonable restrictions on

competition," the burden is on the one asserting their illegality to prove their unreasonableness. Such restraints are not *prima facie* illegal and must be shown to be so.

But is the contract illegal *price fixing* since it prescribes the minimum price at which buyers other than plaintiff could buy stone?

[6] Perhaps the *portion* of the contract purporting to fix the minimum price at which customers *other* than plaintiff could buy stone is illegal price fixing under G.S. 75-1 and G.S. 75-5 (b) (7). *See* Aycock, Antitrust and Unfair Trade Practice Law in North Carolina—Federal Law Compared, 50 N. C. L. Rev. 199, 220 (1972). But we do not decide this question since the invalidity of this portion would not affect the validity of those provisions of the contract establishing the price at which plaintiff could buy. When a contract contains provisions which are severable from an illegal provision and are in no way dependent upon the enforcement of the illegal provision for their validity, such provisions may be enforced. *In re Publishing Co.,* 231 N.C. 395, 57 S.E. 2d 366, 14 A.L.R. 2d 842 (1950) ; *Glover v. Ins. Co.,* 228 N.C. 195, 45 S.E. 2d 45 (1947) ; *Annuity Co. v. Costner,* 149 N.C. 293, 63 S.E. 304 (1908). "It is well established that the fact that a stipulation is unenforceable because of illegality does not affect the validity and enforceability of other stipulations in the agreement, provided they are severable from the invalid portion and capable of being construed divisibly. Moreover, it makes no difference whether there are two distinct promises, whether there is one promise that is divisible, or whether the consideration for the two promises is entire or apportionable. At least this is true where the illegal provision is clearly separable and severable from the other parts which are relied upon and does not consti-tute the main or essential feature or purpose of the agreement." 17 Am. Jur. 2d, Contracts, § 230.

Business contracts providing protection against future price increases are quite common and are not illegal *per se.* Contracts by which a buyer assures himself of adequate supplies for a definite price over a specified period of time are a vital part of the business world. Here, from his own quarry, plaintiff was supplying himself the crushed stone he needed in his ready-mix cement business. When he leased that quarry to J. E. Dooley and Son, Inc., for ten years, "the main or essential feature or purpose" of the contract between him and Dooley was

to assure himself of an adequate amount of crushed stone for ten years at the prices specified in the contract, *viz:* $1.25 per ton for crusher run stone, $1.60 per ton for clean concrete stone, and $2.00 per ton for No. 11 stone, f.o.b. the quarry site at Cycle, North Carolina. These provisions of Exhibit B are in no way dependent for their validity upon the enforcement of the other, arguably illegal, provisions of that contract whereby J. E. Dooley and Son, Inc., agreed that it would not sell stone from the Cycle quarry to others within an eight-mile radius of Elkin for less than $1.50 per ton for crusher run stone, $1.80 per ton for clean concrete stone, and $2.00 per ton for No. 11 stone. Hence, the legal provisions of the contract are severable from the illegal provisions and may be enforced. "When the agreement found violative of public policy is separable from the remainder of the contract, the contract will be given effect as if the provision so violative of public policy had not been included therein." *Gore v. Ball, Inc.,* 279 N.C. 192, 182 S.E. 2d 389 (1971) ; *In re Publishing Co., supra; Durant v. Snyder,* 65 Idaho 678, 151 P. 2d 776 (1944) ; *Keene v. Harling,* 61 Cal. 2d 318, 38 Cal. Rptr. 513, 392 P. 2d 273 (1964) ; Restatement, Contracts, § 603 (1932).

Accordingly, we hold that defendant has not carried its burden of proving the portion of this contract that plaintiff seeks to enforce to be illegal under any law of the State of North Carolina.

Defendant next contends that this action is barred by the three-year statute of limitations, G.S. 1-52. It argues that although the contracts between plaintiff and J. E. Dooley and Son, Inc. (Exhibits A and B) were under seal, its letter of 25 April 1960, advising plaintiff that "Vulcan Materials Company assumes all phases of these contracts," was *not* under seal; and that since plaintiff's action is based upon the unsealed promise to "assume" the obligations of the contracts, the three-year statute applies. The trial court ruled that G.S. 1-47, the ten-year statute of limitations, applied, and defendant assigns same as error.

The agreement between the original parties, embodied in plaintiff's Exhibits A and B, consisted of mutual promises: Plaintiff, after leasing his quarry to J. E. Dooley and Son, Inc., promised not to engage in the rock-crushing business within an eight-mile radius of Elkin for a period of ten years. In return for this promise, J. E. Dooley and Son, Inc., promised, among

other things, to furnish plaintiff stone f.o.b. the quarry site at Cycle, North Carolina, at stipulated prices for ten years. Thus, the agreement was an executory bilateral contract under which plaintiff's promise not to compete for ten years gained him a ten-year option to buy stone at specified prices.

In most states, the assignee of an executory bilateral contract is not liable to anyone for the nonperformance of the assignor's duties thereunder unless he expressly promises his assignor or the other contracting party to perform, or "assume," such duties. *See Langel v. Betz,* 250 N.Y. 159, 164 N.E. 890 (1928); 3 Williston, Contracts, § 418A (3d ed. 1960); Note: Obligations of the Assignee of a Bilateral Contract, 42 Harv. L. Rev. 941 (1929). These states refuse to *imply* a promise to perform the duties, but if the assignee expressly promises his assignor to perform, he is liable to the other contracting party on a third-party beneficiary theory. 4 Corbin, Contracts, § 906 (1951). *Cf. McGill v. Baker,* 147 Wash. 394, 266 P. 138 (1928). And, if the assignee makes such a promise directly to the other contracting party upon a consideration, of course he is liable to him thereon. *See* Simpson, Contracts, § 132 (2d ed. 1965).

A minority of states holds that the assignee of an executory bilateral contract under a general assignment becomes not only assignee of the rights of the assignor but also delegatee of his duties; and that, absent a showing of contrary intent, the assignee *impliedly* promises the assignor that he will perform the duties so delegated. 3 Williston, Contracts, § 418A (3d ed. 1960); 4 Corbin, Contracts, § 906 (1951). This rule is expressed in Restatement, Contracts, § 164 (1932) as follows:

"(1) Where a party under a bilateral contract which is at the time wholly or partially executory on both sides purports to assign the whole contract, his action is interpreted, in the absence of circumstances showing a contrary intention, as an assignment of the assignor's rights under the contract and a delegation of the performance of the assignor's duties.

(2) Acceptance by the assignee of such an assignment is interpreted, in the absence of circumstances showing a contrary intention, as both an assent to become an assignee of the assignor's rights and as a *promise to the assignor to assume the performance of the assignor's duties."* (Emphasis added.)

[7] This Court has never expressly adopted the Restatement Rule (§ 164) in North Carolina. However, in *R. R. v. R. R.*, 147 N.C. 368, 61 S.E. 185 (1908), decided before the Restatement was written, we apparently recognized the rule of implied assumption that later became the Restatement Rule. In that case plaintiff Railroad had a contract to buy a certain amount of cordwood from one Ives. Plaintiff leased its equipment to Howland Improvement Company and assigned to Howland its contract with Ives. Defendant Railroad (assignee) succeeded to the rights and liabilities of Howland and took an assignment of the Ives contract. Defendant Railroad later changed from wood-burning to coal-burning locomotives and refused to purchase wood from Ives as required by the contract. Thereupon, Ives successfully sued plaintiff Railroad (assignor) for damages caused by defendant's refusal to purchase the wood. Plaintiff assignor then sued defendant assignee for reimbursement and recovery was allowed. Despite the absence of an express promise by defendant assignee to assume the obligations of the Ives contract, this Court treated defendant as having assumed and promised to perform plaintiff assignor's duties under the contract with Ives, saying: "When the defendant bought and took an assignment of this contract for the delivery of so much cordwood on its right of way, and thus acquired the right to enforce performance by Ives or recover damages for its breach, it assumed the liability to pay for it when delivered. It could not take over the benefits of the contract without bearing its burdens. Defendant took the contract *cum onere* . . . . " Thus, *R. R. v. R. R.*, supra, recognizes that there is an implied promise of assumption which arises from acceptance of a general assignment. However, the case fails to recognize the limitation, later adopted by the Restatement, that such a promise is implied only *in the absence of circumstances showing a contrary intention*. We think the rule as limited by the Restatement is sound. We therefore adopt the Restatement rule and expressly hold that the assignee under a general assignment of an executory bilateral contract, in the absence of circumstances showing a contrary intention, becomes the delegatee of his assignor's duties and impliedly promises his assignor that he will perform such duties.

The rule we adopt and reaffirm here is regarded as the more reasonable view by legal scholars and textwriters. Professor Grismore says:

Rose v. Materials Co.

"It is submitted that the acceptance of an assignment in this form does presumptively import a tacit promise on the part of the assignee to assume the burdens of the contract, and that this presumption should prevail in the absence of the clear showing of a contrary intention. The presumption seems reasonable in view of the evident expectation of the parties. The assignment on its face indicates an intent to do more than simply to transfer the benefits assured by the contract. It purports to transfer the contract as a whole, and since the contract is made up of both benefits and burdens both must be intended to be included. It is true the assignor has power only to delegate and not to transfer the performance of duties as against the other party to the contract assigned, but this does not prevent the assignor and the assignee from shifting the burden of performance as between themselves. Moreover common sense tells us that the assignor, after making such an assignment, usually regards himself as no longer a party to the contract. He does not and, from the nature of things, cannot easily keep in touch with what is being done in order properly to protect his interests if he alone is to be liable for nonperformance. Not infrequently the assignor makes an assignment because he is unable to perform further or because he intends to disable himself for further performance. The assignee on the other hand understands that he is to carry out the terms of the contract, as is shown by the fact that he usually does, most of the decided cases being those in which the other party objected to performance by the assignee. In view of these considerations is it not reasonable to infer that the assignee tacitly promises to perform?" Grismore, Is the Assignee of a Contract Liable for the Nonperformance of Delegated Duties? 18 Mich. L. Rev. 284 (1920). See Note, Obligations of the Assignee of a Bilateral Contract, 42 Harv. L. Rev. 941 (1929) ; 4 Corbin, Contracts, § 906 (1951).

In addition, with respect to transactions governed by the Uniform Commercial Code, an assignment of a contract in general terms is a delegation of performance of the duties of the assignor, and its acceptance by the assignee constitutes a promise by him to perform those duties. See G.S. 25-2-210(4). Our holding in this case maintains a desirable uniformity in the field of contract liability.

[7]   We further hold that the other party to the original contract may sue the assignee as a third-party beneficiary of his promise of performance which he impliedly makes to his assignor, under the rule above laid down, by accepting the general assignment. *Younce v. Lumber Co.*, 148 N.C. 34, 61 S.E. 624 (1908), holds that where the assignee makes an express promise of performance to his assignor, the other contracting party may sue him for breach thereof. We see no reason why the same result should not obtain where the assignee breaches his promise of performance *implied* under the rule of Restatement § 164. "That the assignee *is* liable at the suit of the third party where he expressly assumes and promises to perform delegated duties has already been decided in a few cases [citing *Younce*]. If an express promise will support such an action it is difficult to see why a tacit promise should not have the same effect." *Grismore, supra.* Parenthetically, we note that such is the rule under the Uniform Commercial Code, G.S. 25-2-210 (4).

[8]   We now apply the foregoing principles to the case at hand. The contract of 23 April 1960, Exhibit F, between defendant and J. E. Dooley and Son, Inc., under which, as stipulated by the parties, "the defendant purchased the assets and obligations of J. E. Dooley and Son, Inc.," was a general assignment of *all* the assets and obligations of J. E. Dooley and Son, Inc., including those under Exhibit B. When defendant accepted such assignment it thereby became delegatee of its assignor's duties under Exhibit B and impliedly promised to perform such duties.

When defendant later failed to perform such duties by refusing to continue sales of stone to plaintiff at the prices specified in Exhibit B, it breached its implied promise of performance and plaintiff was entitled to bring suit thereon as a third-party beneficiary. Therefore, it is not the promise contained in defendant's letter of 25 April 1960 that is the foundation of defendant's liability to plaintiff, and the fact that this letter was not under seal is immaterial. Instead, defendant is liable for breach of its implied promise of performance arising upon its acceptance of the general assignment.

Statutes of limitation may be characterized as a right not to be sued beyond the time limited. Here, the assignor J. E. Dooley and Son, Inc., had a right not to be sued after ten years from the accrual of a cause of action under the sealed contract it entered into with plaintiff. By assigning this contract,

Dooley and Son, Inc., could not confer upon defendant assignee a greater immunity to suit than the assignor itself possessed. This is true by analogy to the familiar principle that " . . . the assignor of a non-negotiable chose in action cannot confer upon the assignee a greater right than he possesses." *Iselin and Co. v. Saunders,* 231 N.C. 642, 58 S.E. 2d 614 (1950). When defendant impliedly assumed its assignor's contractual obligations under the general assignment, it exposed itself for ten years to suit on the sealed contract. "The assignee steps into the shoes of the assignor. . . . " *Cook v. Eastern Gas and Fuel Associates,* 129 W.Va. 146, 39 S.E. 2d 321 (1946). *See also, Gould v. Jackson,* 257 Wis. 110, 42 N.W. 2d 489 (1950) ; *Dennis v. Bank of America Nat. Trust & Savings Ass'n.,* 34 Cal. App. 2d 618, 94 P. 2d 51 (1939).

For the reasons stated, we hold that the ten-year statute of limitations applies. This assignment of error is therefore without merit and is overruled.

Defendant contends that when it refused to sell stone f.o.b. the Cycle quarry at the price specified in Exhibit B, plaintiff elected to pay the increased price and thus waived the breach for which he seeks to recover damages in this action. The trial court held that plaintiff did not waive the breach by continuing to buy stone from defendant at the higher price. This ruling constitutes defendant's third assignment of error.

Waiver is an affirmative defense which defendant must plead. G.S. 1A-1, Rule 8(c). Having pled waiver, defendant has the burden of proving it.

[9] When a seller refuses to perform his contract at the agreed price and demands a higher price, the buyer who proceeds to buy at such higher price may recover the overpayments in a suit for restitution if he can establish that he acted under economic duress. *See Austin Instrument, Inc. v. Loral Corp.,* 29 N.Y. 2d 124, 324 N.Y.S. 2d 22, 272 N.E. 2d 533 (1971) ; *Brown v. Worthington,* 162 Mo. App. 508, 142 S.W. 1082 (1912) ; *Mandel v. National Ice and Coal Co., Inc.,* 180 N.Y.S. 429 (1920) (recovery denied, insufficient showing of economic duress) ; 13 Williston, Contracts, § 1617 (3d ed. 1970) ; *Dalzell,* Duress by Economic Pressure, Parts I and II, 20 N.C. L. Rev. 237, 341 (1942) ; Dobbs, Remedies, § 10.2 (1973). *Compare Ross Systems v. Linden Dairi-Delite, Inc.,* 35 N.J. 329, 173 A. 2d 258 (1961) ; *Newland v. Turnpike Co.,* 26 N.C. 372

---

Rose v. Materials Co.

---

(1843). We hold that a buyer who proceeds to buy at the higher price and then sues for damages for breach of contract may likewise recover where he shows that he acted under economic duress.

What are the essential characteristics of economic duress? "A threatened violation of a contractual duty ordinarily is not in itself coercive, but if failure to receive the promised performance will result in irreparable injury to business, the threat may involve duress." 13 Williston, Contracts, § 1617 (3d ed. 1970).

"Perhaps the cases would support, for some jurisdictions at least, the generalization that a threat to breach a contract, if it does create severe economic pressure upon the other party, can constitute duress where the threat is effective because of economic power not derived from the contract itself." Dobbs, Remedies, § 10.2 (1973).

"However, a mere threat by one party to breach the contract by not delivering the required items, though wrongful, does not in itself constitute economic duress. It must also appear that the threatened party could not obtain the goods from another source of supply. . . . " *Austin Instrument, Inc. v. Loral Corp., supra.* In addition, it must appear that there was "no immediate and adequate remedy in the courts" which would enable the buyer to resist the seller's demand. *Ross Systems v. Linden Dairi-Delite, Inc., supra.*

[10] Here, the trial court found: "Plaintiff protested defendant's increased price to him and promised the defendant that he would sue for overcharges. He did so. In view of the fact that plaintiff had no other practical source for stone with which to continue his business and that he had the alternative of either going out of business or continuing to purchase from the defendant, this court finds as a fact that his conduct in continuing to purchase stone from the defendant under the circumstances did not constitute a waiver of his rights under the contracts."

When jury trial is waived and issues of fact are tried by the court, it is required to give its decision in writing with its findings of fact and conclusions of law stated separately. G.S. 1A-1, Rule 52. Its findings of fact have the force and effect of a verdict by a jury and are conclusive on appeal if there is evidence to support them, even though the evidence might

sustain a finding to the contrary. *Knutton v. Cofield,* 273 N.C. 355, 160 S.E. 2d 29 (1968). Thus, the foregoing finding, supported by competent evidence, conclusively establishes that there was no other practical source of stone available to plaintiff during the contract period and that plaintiff's only alternatives were to purchase from defendant or go out of business.

In this regard we note that plaintiff could not reasonably have rescinded the lease of his quarry (Exhibit A) and reopened it to supply himself with stone because he had sold his rock-crushing equipment to J. E. Dooley and Son, Inc., before or at the time Exhibit A was executed. Furthermore, plaintiff protested the increase in price in violation of the terms of Exhibit B, and such protest is additional evidence of duress. *Western Natural Gas Co. v. Cities Service Gas Co.,* 201 A. 2d 164 (Del. 1964); *Baker v. Allen,* 220 S.C. 141, 66 S.E. 2d 618 (1951); *Wasina Housing Corp. v. Levay,* 188 Md. 383, 52 A. 2d 903 (1947).

Under these circumstances, we think that defendant's threatened, and actual, breach of contract was coercive, and that plaintiff yielded because of economic duress. The threat was effective as a result of defendant's economic power derived from his status as sole supplier of stone, not because of any economic power derived from the contract itself. Dobbs, supra, § 10.2. This economic power continued through the entire ten-year term of the contract, so that the economic duress was likewise continuous. It is also apparent that plaintiff had no "immediate and adequate remedy in the courts" which would have enabled him to resist defendant's demands. A suit for specific performance would have been inadequate for the reason that plaintiff had immediate need for the stone in order to service his customers in the ready-mix cement business. Dobbs, supra, § 10.2.

In legal parlance, the word *waiver* means the voluntary relinquishment of a known right. Webster's New International Dictionary, Second Edition. Nothing in this record supports the suggestion that plaintiff waived defendant's breach of contract. Rather, the evidence establishes economic duress and coercive rather than voluntary action on plaintiff's part and fully supports the finding of the trial court. This assignment is overruled.

[11] Defendant's fourth assignment questions the amount of damages. The plaintiff's claim for damages is based upon the

difference between the contract price named in Exhibit B and the price he was actually charged for stone purchased from defendant after 11 May 1961.

The contract in question, Exhibit B, calls for the sale of stone f.o.b. the Cycle quarry. At some undisclosed time prior to 1965, defendant closed the Cycle quarry and, for its own convenience, shifted to its quarry located at Elkin, referred to as "the Elkin quarry." Thereafter, until the expiration of the contract on 1 January 1969, plaintiff's orders for stone were filled f.o.b. the Elkin quarry.

Defendant offered evidence tending to show that the Elkin quarry was 7.34 miles closer than the Cycle quarry to plaintiff's place of business in Jonesville; that the cost of hauling stone was four cents per ton-mile; that of the total tonnage bought by plaintiff under the contract in question, 5,082 tons were purchased f.o.b. the Cycle quarry and 98,594 tons were purchased f.o.b. the Elkin quarry; that defendant opened the Elkin quarry and closed the Cycle quarry because the Elkin quarry was closer to the centers of population. Defendant contends that plaintiff's damages, if he suffered any by reason of defendant's breach of contract, should be offset by the amount plaintiff saved due to the shorter haul; that plaintiff has the burden of proof on the issue of damages and failed to carry it in that there is no evidence as to plaintiff's "net loss." Defendant therefore argues that plaintiff failed to prove any damages and that the trial court erred in failing to find facts and make legal conclusions accordingly.

Plaintiff, on the other hand, contends that he proved overcharges in the amount of $25,231.57 and had no further burden of proof. Plaintiff argues that delivery distances depended on the location of his customers; that if buying stone at the Elkin quarry inured to his monetary advantage and lessened the damages flowing from defendant's breach, the burden of proof with respect thereto was on the defendant.

On this question, the trial court found as follows:

"23. In the trial of this action, defendant introduced evidence with respect to reduced mileage between plaintiff's place of business and the Elkin quarry, as opposed to the Cycle quarry. Defendant contends that such reduced mileage between plaintiff's place of business and the Elkin quarry would offset any damages which might have been

sustained by the plaintiff by reason of excess charges. Plaintiff's cement business involved the delivery of ready mixed concrete to his various customers in Yadkin County and surrounding areas. This concrete was mixed and delivered in large trucks such as are commonly seen in the ready mixed concrete business. It does not appear from the evidence as to where plaintiff's customer or customers were located with reference to either the Elkin or the Cycle quarries. There is no evidence as to whether the trucks delivering and mixing the concrete were loaded with the rock at the plaintiff's place of business or whether they picked up the rock at the quarry. The Court finds as a fact that there is no evidence to show that the difference in mileage asserted by defendant represented any savings to plaintiff and, depending on where plaintiff's customers were located, could have resulted in additional expense to plaintiff."

The measure of damages for breach of a contract of sale is generally the difference between the contract price and the market price of the goods at the time and place performance is due. 3 Williston, Sales, § 599 (2d ed. 1948) ; *Mills v. McRae,* 187 N.C. 707, 122 S.E. 762 (1924). "And where, by the terms of the contract, the goods are to be delivered by installments or at stated periods, the time of delivery will be the date for the delivery of each installment successively, the damage being the aggregate of these differences . . . as of these respective dates, and interest where allowed." *Hosiery Co. v. Cotton Mills,* 140 N.C. 452, 53 S.E. 140 (1906).

Exhibit B was not itself a contract of sale. Instead, it gave plaintiff an option to buy. It was a continuing offer to sell which, having been given for a sufficient consideration, was irrevocable for the stated ten-year period. *See* 1 Williston, Contracts, § 61B (3d ed. 1957) ; 1A Corbin, Contracts, § 157 (1963). Each time plaintiff placed an order with defendant there was an acceptance of the seller's offer and a contract of sale was formed. Each time defendant refused to fill such order at the contract price a separate breach occurred. Therefore, plaintiff's measure of damages for the successive breaches is the aggregate of the differences between the market price as of the date of each breach and the contract price.

All the evidence tends to show that defendant charged plaintiff "the market price" for stone after 11 May 1961. The

contract price is shown by Exhibit B. Thus, plaintiff carried his burden of proving the general measure of damages when he offered evidence from which the difference between these two figures could be ascertained. Nothing else appearing, such is the amount plaintiff is entitled to recover.

We need not decide whether the hauling expenses allegedly saved here are properly deductible as expenses saved in consequence of the breach—apparently the present rule under the Uniform Commercial Code, G.S. 25-2-713(1). The burden of proving the amount of such "saved expenses" is, in any event, on defendant. Absent such proof, the general measure of damages is recoverable. *Compare Distributing Corp. v. Seawell,* 205 N.C. 359, 171 S.E. 354 (1933); *Monger v. Lutterloh,* 195 N.C. 274, 142 S.E. 12 (1928); *Mills v. McRae, supra,* holding that the burden of proof is upon defendant to show that plaintiff has, or could have, minimized his damages for breach of contract and that in the absence of such a showing the general measure obtains.

Here, the trial court properly placed the burden of proof and defendant failed to carry it. The findings of the trial court, supported by competent evidence, are correct and binding on this appeal. Defendant's fourth assignment is overruled.

[12] Although the contract sued on, Exhibit B, is not itself a lease of land, it provides the consideration for the lease of plaintiff's quarry (Exhibit A) and was executed contemporaneously therewith as part of one transaction. The statute of frauds requires all contracts and leases affecting an interest in real property, exceeding three years in duration, to be in writing "and signed by the party to be charged therewith." G.S. 22-2. Defendant contends that since the lease of plaintiff's quarry (Exhibit A) was signed by J. E. Dooley individually rather than J. E. Dooley and Son, Inc., the party sought to be charged, it does not comply with the statute; and since the contract sued on (Exhibit B) was executed in like manner *as part of one transaction,* it contains the same defect and is not enforceable. Failure of the trial court to so hold constitutes defendant's fifth assignment of error.

The opening paragraph of Exhibit B reads as follows: "This contract and agreement made and entered into this the 1st day of January, 1959 by and between T. W. Rose of Yadkin County, hereinafter called the buyer and J. E. Dooley and Son,

Inc., of Iredell County, hereinafter called the seller." The instrument is signed "J. E. Dooley (SEAL)." With respect to this instrument, J. E. Dooley testified as follows: "In December of 1958 I owned a corporation named J. E. Dooley and Son, Inc. I was president of it and I did business under that name. As well as I can remember I signed contracts with Mr. Rose in behalf of my corporation."

Assuming arguendo, without deciding, that the contract sued on (Exhibit B) is subject to the statute of frauds, we think it meets the requirements of that statute. J. E. Dooley, the signer of the contract, was president of J. E. Dooley and Son, Inc., and therefore its general agent. He testified he signed the instrument "in behalf of my corporation." The instrument itself named the corporation as one of the parties to the agreement, thus revealing the clear intent to bind it. "The president of a corporation is *ex vi termini* its general agent," *Warren v. Bottling Co.,* 204 N.C. 288, 168 S.E. 226 (1933), and can ordinarily make contracts for the company. The statute of frauds presents no problem here. "If there be a written memorial of so much of the contract as is binding on the party to be charged therewith, so expressed that its terms can be understood, and it be signed by one who is proved or admitted by the principal to have been authorized as agent to act for him, it is a sufficient compliance with the statute if the agent sign his own name instead of that of his principal by him." *Hargrove v. Adcock,* 111 N.C. 166, 16 S.E. 16 (1892). Furthermore, a subsequent ratification of an unauthorized signing "will make it valid within the statute." *Johnson v. Sikes,* 49 N.C. 70 (1856).

J. E. Dooley and Son, Inc., as well as J. E. Dooley individually, honored this contract and accepted the benefits thereunder without objection from the date of its execution until the date of its assignment to defendant on 23 April 1960. Defendant Vulcan Materials Company honored this contract and accepted the benefits thereunder without objection from the date of assignment until it raised the price of stone on 11 May 1961. In light of these facts, we hold that the contract has been ratified and, in the eyes of the law, is binding on defendant. Even though a contract is made by an officer or agent of a corporation in his own name, the name of the corporation not appearing therein, the corporation will nevertheless be held liable "where it has adopted the contract, acquiesced therein, or received the benefits thereof." 7 Fletcher, Cyclopedia of the Law of Private Corpora-

tions, § 3016 (1964). Defendant's fifth assignment of error is overruled.

[13]   Finally, defendant contends that the judgment provides for the payment of interest "but does not contain all the information necessary by which interest may be computed." The nature of the missing information is not specified. Even so, defendant contends the judgment is invalid by reason of indefiniteness.

It is provided by statute that "[a]ll sums of money due by contract of any kind, excepting money due on penal bonds, shall bear interest, and when a jury shall render a verdict therefor they shall distinguish the principal from the sum allowed as interest. . . . " G.S. 24-5. In *Bond v. Cotton Mills,* 166 N.C. 20, 81 S.E. 936 (1914), this Court referred to the statute which is now G.S. 24-5 and laid down the following rule: " . . . [W]henever a recovery is had for breach of contract and the amount is ascertained from the terms of the contract itself or *from evidence relevant to the inquiry,* . . . interest should be added. . . . " (Emphasis added.) Since the decision in *Bond,* the trend is toward allowance of interest in almost all types of cases involving breach of contract. *Construction Co. v. Crane and Denbo, Inc.,* 256 N.C. 110, 123 S.E. 2d 590 (1962).

In *General Metals v. Mfg. Co.,* 259 N.C. 709, 131 S.E. 2d 360 (1963), with reference to interest on a judgment for breach of contract, it is said: "The later cases following the enactment of G.S. 24-5 seem to have established this rule: When the amount of damages in a breach of contract action is ascertained from the contract itself, or from relevant evidence, or from both, interest should be allowed from the date of the breach." The judgment in this case follows that established rule and allows interest from the date of each overpayment. Those dates are easily ascertainable from relevant evidence in the case. All that remains to be done is purely and simply a matter of mathematical calculation. There is no merit in this assignment and it is overruled.

The decision of the Court of Appeals is reversed with directions that the case be certified to the Superior Court of Forsyth County for reinstatement of the judgment of the trial court in accordance with this opinion.

Reversed.