**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

In Re: MACO HOMES, INCORPORATED,
Debtor.

BOB MCLEMORE AND COMPANY,
INCORPORATED; BOB MCLEMORE
HOMES, INCORPORATED; APPLE HOMES,
INCORPORATED; APPLE REALTY 2000,
INCORPORATED; BMI LAND COMPANY,
INCORPORATED; MACO HOMES,
INCORPORATED,

Plaintiffs-Appellants,

v.

BRANCH BANKING & TRUST COMPANY;
HOME FEDERAL SAVINGS AND LOAN
ASSOCIATION OF CHARLOTTE,
Defendants-Appellees,

v.

ROBERT V. MCLEMORE,
Third Party Defendant-Appellant.

No. 95-2938

In Re: MACO HOMES, INCORPORATED,
Debtor.

BOB MCLEMORE AND COMPANY,
INCORPORATED; BOB MCLEMORE
HOMES, INCORPORATED; APPLE HOMES,
INCORPORATED; APPLE REALTY 2000,
INCORPORATED; BMI LAND COMPANY,
INCORPORATED; MACO HOMES,
INCORPORATED,

No. 95-2939

Plaintiffs-Appellants,

v.

BRANCH BANKING & TRUST COMPANY;
HOME FEDERAL SAVINGS AND LOAN
ASSOCIATION OF CHARLOTTE,
Defendants-Appellees,

v.

ROBERT V. MCLEMORE,
Third Party Defendant.

Appeals from the United States District Court
for the Western District of North Carolina, at Charlotte.
Graham C. Mullen, District Judge.
(CA-95-60-3-MU, CA-95-4-3-MU, BK-94-30421)

Argued: April 5, 1996

Decided: September 10, 1996

Before RUSSELL and MOTZ, Circuit Judges, and LAY,
Senior Circuit Judge of the United States Court of Appeals for
the Eighth Circuit, sitting by designation.

2

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Wyatt B. Durrette, Jr., DURRETTE, IRVIN & BRAD-
SHAW, P.C., Richmond, Virginia, for Appellants. Edwin Osborne
Ayscue, Jr., SMITH, HELMS, MULLISS & MOORE, L.L.P., Char-
lotte, North Carolina, for Appellee Branch Banking; Robert C. Ste-
phens, HORACK, TALLEY, PHARR & LOWNDES, Charlotte,
North Carolina, for Appellee Home Federal. **ON BRIEF:** William O.
Quirey, Hammarstrom Davies, Durham, North Carolina, for Appel-
lants. Robert H. Pryor, SMITH, HELMS, MULLISS & MOORE,
L.L.P., Charlotte, North Carolina, for Appellee Branch Banking;
G. Robert Turner, III, Zipporah Marie Basile, HORACK, TALLEY,
PHARR & LOWNDES, Charlotte, North Carolina, for Appellee
Home Federal.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Bob McLemore & Co., Inc. ("BMC") and its subsidiary companies
(collectively, the "McLemore group"), brought numerous claims
against Home Federal Savings & Loan Association of Charlotte
("Home Federal") and Branch Bank & Trust Co. ("BB&T"). On the
defendants' motions for summary judgment, the district court dis-
missed all claims against the defendants because the McLemore
group had previously executed valid, written agreements releasing the
defendants from all such claims. The McLemore group allege that
they entered into those written releases under fraud and duress. We
agree with the district court's finding that no fraud or duress occurred,
and we affirm the judgment of the district court.

I.

Robert V. McLemore is the president and sole shareholder of BMC, which is engaged in land development and home construction. BMC is the corporate parent of BMI Land Co., Inc. ("BMI Land"), Bob McLemore Homes, Inc. ("BMH"), Apple Homes, Inc. ("Apple Homes"), Apple Realty 2000, Inc. ("Apple Realty"), and MACO Homes, Inc. ("MACO Homes"). BMI Land is engaged in the purchase and development of tracts of land for home construction. BMH and Apple Homes are engaged in the construction of new homes. To induce customers to purchase new homes, McLemore created the "trading places" program; under this innovative program, a person who signed a construction contract for a new home with BMH or Apple Homes could trade in his existing home, which the McLemore group agreed to sell before the completion of the new home. Apple Realty was created to list and sell the new home buyers' existing homes. If Apple Realty could not sell the existing home before the closing of the new home, MACO Homes would purchase the existing home and manage it as rental property.

Since 1972, the McLemore group worked closely with Home Federal to finance all phases of its construction operations. When the McLemore group wanted to begin development of a property, Home Federal would make the initial acquisition and development loan to BMI Land. When BMH or Apple Homes sold lots to individual home buyers, Home Federal would make the construction loans to McLemore and use the proceeds of those loans to pay down the initial acquisition and development loan. After construction of the new homes and upon closing with the home buyers, Home Federal made the permanent mortgage loans to the home buyers and used the proceeds to pay down the construction loans. If necessary, Home Federal made a second permanent mortgage loan to finance the sale of the customer's existing home either to a third-party or to MACO Homes. For many years, the McLemore group and Home Federal enjoyed an extremely close and very profitable financing relationship.

In 1988, the McLemore group proposed a drastic expansion in the scope of its business--from three to nineteen residential development projects. Home Federal approved the financing of the new construc-

4

tion, and the McLemore group began purchasing and developing tracts of land.

In August 1989, however, Congress enacted the Financial Institutions Reform Recovery and Enforcement Act ("FIRREA"), which necessarily altered the McLemore group's financing relationship with Home Federal. FIRREA imposed a requirement on thrift institutions that prevented them from extending more than 15% of its unimpaired capital to a single borrower. Although a thrift could seek and receive a waiver from the Office of Thrift Supervision ("OTS"), allowing it to loan up to 30% of its unimpaired capital to a single borrower, even the 30% limit restricted Home Federal's ability to continue financing the McLemore group's activities in the same manner as it had in the past.

Because Home Federal could no longer meet all of the McLemore group's financing needs, the McLemore group started doing business with BB&T, which had actively sought the McLemore group as a client. On March 28, 1990, BB&T executed a commitment to loan the McLemore group seven million dollars--one million dollars to BMI Land for land development, five million dollars to BMH and Apple Homes for homes construction, and one million dollars to MACO Homes for the purchase of rental homes. On August 7, 1991, BB&T and the McLemore group executed another commitment agreement that replaced the March 28, 1990 agreement. The terms of the August 7, 1991 agreement specified that the commitment to lend expired on September 1, 1992. Between March 1990 and June 1992, BB&T made loans to the McLemore group in accordance with the terms of the commitment agreements.

By June 1992, however, BB&T had determined that the financial condition of the McLemore group was deteriorating. On June 24, 1992, BB&T informed the McLemore group that it would not renew its commitment to provide financing beyond the September 1, 1992 expiration date of the August 7, 1991 agreement. BB&T and the McLemore group negotiated a schedule by which the McLemore group would repay its outstanding debts to BB&T. The parties executed a repayment agreement on October 5, 1992. By December 1992, the McLemore group had defaulted under the terms of the

repayment agreement. The parties began negotiating a workout agreement for the McLemore group's defaults.

On April 8, 1993, the McLemore group and BB&T executed a written workout agreement. Under this agreement, BB&T accepted the deeds to certain properties and released the McLemore group from its indebtedness on those properties, thus avoiding the need for foreclosure proceedings. BB&T also extended some of the McLemore group's obligations and loaned additional money to pay certain liens and interest payments, thus giving the McLemore group an opportunity to work out the defaults on some of the properties. The McLemore group also released BB&T from any and all claims known or unknown, absolute or contingent, matured or unmatured that the McLemore group had against BB&T. During the course of the negotiations culminating in the workout agreement, the McLemore group was represented by counsel.

The McLemore group subsequently defaulted on the terms of the April 8, 1993 workout agreement, and BB&T foreclosed on the remaining properties.

Meanwhile, the McLemore group's financial position with Home Federal had also deteriorated. The McLemore group defaulted on its Home Federal loans in 1991. As it had done in the past, Home Federal worked with the McLemore group to bring the loans current. By June 1993, MACO Homes had defaulted on all its loans from Home Federal, as well as its loans from Southern National Bank of North Carolina ("Southern National") and United Carolina Bank ("UCB"). After a series of negotiations, the McLemore group, Home Federal, Southern National, and UCB entered an agreement, in which the three banks loaned MACO Homes additional funds to bring its loans current.

By July 1993, the McLemore group remained in default on the acquisition and development loans to BMI Land and the home construction loans to BMH. The McLemore group and Home Federal negotiated a workout agreement, which the parties executed on August 20, 1993. Under this agreement, Home Federal granted the McLemore group a six-month forbearance period on its defaults, giving the McLemore group a chance to sell properties and pay down its

6

indebtedness. Home Federal also reduced the interest rate on certain loans during this forbearance period, and it forgave $390,206 in past due interest. The workout agreement also included the McLemore group's release from any claims that the McLemore group had against Home Federal. The McLemore group was represented by counsel when it negotiated and signed the workout agreement with Home Federal.

The McLemore group was unsuccessful in its efforts to sell properties and to pay down its outstanding debt. At the end of the forbearance period, the McLemore group's loans remained in default. Home Federal informed the McLemore group of its obligation under the workout agreement to deliver the deeds to Home Federal in lieu of foreclosure.

In response, the McLemore group filed a complaint against Home Federal and BB&T in North Carolina state court on February 22, 1994. When three of the McLemore group companies filed for bankruptcy, this action was removed to the United States Bankruptcy Court for the Western District of North Carolina. In two separate entries of proposed findings of fact and conclusions of law, the bankruptcy court recommended the entry of summary judgment on all claims against Home Federal and BB&T because, inter alia, the April 8, 1993 workout agreement and the August 20, 1993 workout agreement released Home Federal and BB&T from all of the claims brought by the McLemore group. The district court adopted verbatim the bankruptcy court's proposed findings of fact and conclusions of law. The McLemore group filed a timely appeal.

II.

We review the district court's grant of summary judgment de novo. Evans v. Technologies Applications & Serv. Co. , 80 F.3d 954, 958 (4th Cir. 1996). Although the district court asserted several reasons for dismissing the McLemore group's claims, its primary reason was the existence of the release provisions in the April 8, 1993 and August 20, 1993 workout agreements. The McLemore group contends that the district court should not have enforced the release provisions for two reasons: first, the McLemore group signed the workout agreements under duress, and second, the McLemore group was defrauded

into signing the workout agreements. We consider each argument in turn.

## A. Duress

Under North Carolina law, a person who enters into a contract under duress can avoid his obligations under that contract. Duress exists "where one by the unlawful act of another is induced to make a contract or perform or forego some act under circumstances which deprive him of the exercise of free will." Adder v. Holman & Moody, Inc., 219 S.E.2d 190, 194 (N.C. 1975). Although duress may arise from the wrongful use of physical force or threats of physical force, it can also arise from the wrongful exertion of economic pressure. However, not every imbalance in economic power creates a situation of economic duress. Economic duress arises from the illegitimate use of economic power outside the bounds of a contract or the law. See Rose v. Vulcan Materials Co., 194 S.E.2d 521, 536 (N.C. 1973). Thus, the mere threat by one party to breach a contract, though wrongful, does not establish economic duress. Id . Economic duress occurs when a party's wrongful action forces another to make a contractual promise, or else suffer irreparable injury to his business. See id. In addition, the wronged party must have "no immediate and adequate remedy in the courts" that would enable him to resist the other's demands. Id.

The McLemore group contends that it signed the workout agreements under duress. We disagree for two reasons. First, neither BB&T nor Home Federal exerted any undue economic pressure on the McLemore group. The threat of foreclosure certainly pressured the McLemore group into signing the workout agreements, but BB&T and Home Federal had the legal right to threaten foreclosure because the McLemore group defaulted on its loans. Neither BB&T nor Home Federal created the McLemore group's weak financial position, thus forcing it to negotiate workout agreements from a weak bargaining position.*

_____

*The McLemore group alleges that Home Federal created artificial defaults by deliberately misapplying the McLemore group's loan payments: instead of using loan payments first to pay off any interest due

8

Second, the undisputed evidence in the record demonstrates that, as an alternative to signing the workout agreements, the McLemore group could have sought the protection of the bankruptcy code. Instead, and with the hopes of saving its business, the McLemore group chose to enter workout agreements that released BB&T and Home Federal from any actions it could pursue against them. Because the McLemore group had an alternative to signing the workout agreements, it cannot argue that it entered those agreements under duress.

B. <u>Fraud</u>

Next, the McLemore group contends that BB&T and Home Federal, on several occasions, represented to it that BB&T and Home Federal were not planning a merger. The McLemore group alleges that BB&T and Home Federal began merger negotiations as far back as 1989, culminating in a merger agreement at the end of 1993. The McLemore group also alleges that Home Federal represented to the McLemore group that the OTS had denied Home Federal a 30% waiver in 1992, when in fact Home Federal never applied for such a waiver. Furthermore, the McLemore group alleges that Home Federal misapplied the McLemore group's payments, causing the McLemore

_____

and then to pay down principal, Home Federal began applying the entire loan payment to pay down principal, thus allowing the McLemore group to fall behind on interest payments. The McLemore group has supported its allegations with verified affidavits, and we do not resolve this factual dispute at this stage of the proceedings.

Nonetheless, such misconduct, even if it occurred, would not establish that the McLemore group signed the workout agreement with Home Federal under duress. If Home Federal had misapplied loan payments, the McLemore group either knew or should have known of this fact before it signed the workout agreement. Although the McLemore group trusted Home Federal to handle the accounting of its loan payments, it had a duty to make at least some inquiries to ensure that Home Federal kept the books correctly. Certainly by the time Home Federal threatened foreclosure proceedings, the McLemore group should have investigated to ensure that Home Federal had correctly applied the loan payments to its debts. By signing the workout agreement, the McLemore group chose to release Home Federal from its misconduct in exchange for a forbearance period to cure its loan defaults.

9

group to fall behind in its interest payments and to default on its loans. The McLemore group argues that it would not have signed the workout agreements if it had known about the defendants' fraud.

Although the McLemore group's allegations may serve as the basis of fraud actions against BB&T and Home Federal, the McLemore group released the defendants from such actions in the workout agreements. There is no evidence in the record that BB&T and Home Federal fraudulently induced the McLemore group to sign the release agreements. With regard to each of the two workout agreements, the district court found that the McLemore group actively participated in the negotiations, reviewed drafts of the agreement, and made changes to the agreement. The McLemore group was represented by counsel throughout the negotiations and the signing of the agreements. The district court found that the McLemore group knew that each workout agreement contained a release provision when it signed the agreement.

Like the district court, we conclude that the undisputed facts demonstrate that the McLemore group was not induced by fraud to enter into the workout agreements with BB&T and Home Federal.

III.

We agree with the district court that the release provision in the workout agreements is a valid defense against all of the McLemore group's claims against BB&T and Home Federal. Therefore, we need not consider the McLemore group's other arguments. We affirm the district court's entry of summary judgment in favor of the defendants on all claims.

AFFIRMED

10