Loyd v. Griffin, 2021 NCBC 77.

STATE OF NORTH CAROLINA

IREDELL COUNTY

ASHTON K. LOYD,

          Plaintiff,

v.

JAMES MICHAEL GRIFFIN and
GRIFFIN INSURANCE AGENCY,
INC.,

          Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS 2394

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO DISMISS
AND MOTION TO STRIKE**

1.     **THIS MATTER** is before the Court on Defendants' James Michael Griffin and Griffin Insurance Agency, Inc. Motion to Dismiss Plaintiff's Amended Complaint (the "Motion to Dismiss"), (ECF No. 36), and Defendants James Michael Griffin's and Griffin Insurance Agency, Inc.'s Motion to Strike (the "Motion to Strike"), (ECF No. 38), (the Motion to Dismiss and Motion to Strike are collectively referred to as the "Motions").

2.     For the reasons set forth herein, the Court hereby **GRANTS IN PART** and **DENIES IN PART** the Motion to Dismiss[1] and **DENIES** the Motion to Strike.

*Levine Law Group, P.A. by Michael J. Levine and Cathy A. Williams, Austin Law Firm, PLLC by John S. Austin, and Mauney, PLLC by Gary V. Mauney for Plaintiff Ashton K. Loyd.[2]*

---

[1] The Court notes that presently pending before the Court, but not fully briefed, is Plaintiff's Motion for Leave to File Second Amended Complaint. (ECF No. 71.) The Court, in its discretion, rules on the current Motions, which are fully briefed and for which oral argument has been conducted.

[2] John S. Austin of Austin Law Firm, PLLC, and Gary V. Mauney of Mauney, PLLC, entered appearances on behalf of Ashton K. Loyd ("Loyd") on 5 August 2021. (ECF Nos. 67–68.) Mr. Austin and Mr. Mauney did not represent Loyd at the time of the hearing held on the Motions. (*See* ECF No. 51.)

*Bennett & Guthrie, PLLC by Joshua H. Bennett and Mitchell Hendrix Blankenship for Defendants James Michael Griffin and Griffin Insurance Agency, Inc.*

Robinson, Judge.

## I.     INTRODUCTION

3.      Defendants James Michael Griffin ("Griffin") and Griffin Insurance Agency, Inc. ("GIA") (Griffin and GIA are collectively referred to as the "Defendants") move to dismiss the following claims for relief from Loyd's First Amended Complaint (the "Amended Complaint") (ECF No. 29 ["Am. Compl."]): (1) Count II—Tortious Interference with Plaintiff's Business; (2) Count III—Recission; (3) Count IV—Unjust Enrichment; and Count VI—Punitive Damages.  (Defs.' Mot. Dismiss Pl.'s Am. Compl., ECF No. 36 ["Mot. Dismiss"].)  Additionally, Defendants move to strike the last sentence of Paragraph 11 of the Amended Complaint on the basis that it alleges matters that are irrelevant, immaterial, impertinent, and scandalous.  (Defs.' Mot. Strike, ECF No. 38 ["Mot. Strike"].)

## II.     FACTUAL BACKGROUND

4.      The Court does not make findings of fact on a Rule 12(b)(6) motion to dismiss. Instead, the Court only recites the factual allegations, taken from Loyd's Amended Complaint, that are relevant to the Court's determination of the Motion to Dismiss.[3]

---

[3] The Court in deciding the Motion to Dismiss will consider only such matters as are raised in the Amended Complaint filed in this case, per Rule 12(b)(6).  Anything referenced in briefing by the parties, in oral argument at the hearing on the Motions, or that was otherwise not contained in the current complaint on record in this matter or relevant legal precedent was not considered in the issuance of this Order and Opinion.

## A. The Parties

5.    Loyd is a resident of Iredell County, North Carolina.  (Am. Compl. ¶ 1.)  At all relevant times, Loyd was an officer and the Vice President of GIA.  (Am. Compl. ¶ 1.)

6.    Griffin is a resident of Mecklenburg County, North Carolina.  (Am. Compl. ¶ 2.)  At all relevant times, Griffin was the President of GIA.  (Am. Compl. ¶ 2.)

7.    GIA is a North Carolina corporation with a principal office located in Iredell County, North Carolina.  (Am. Compl. ¶ 3.)

## B. Loyd's Employment with GIA

8.    Around 2004 Loyd began selling property and casualty policies for Nationwide Mutual Insurance Company ("Nationwide") on behalf of Defendants.  (Am. Compl. ¶ 8.)  At the start of his employment relationship with GIA, Loyd asserts Griffin intended to have Loyd "take over the business someday."  (Am. Compl. ¶ 8.)

9.    "[A]t the direction of Defendant Griffin and his certified public accountant," Loyd created Loyd Insurance Agency in early 2010.  (Am. Compl. ¶ 12.)  Around that same time, Loyd and Defendants also agreed to a Revenue Purchase Agreement and Asset Purchase Agreement (the "Revenue Purchase Agreement").  (Am. Compl. ¶ 13.)  "Under the terms of the Revenue Purchase Agreement, [Loyd] purchased some of Griffin's Nationwide book of business, the purpose being to effectuate [Loyd's] ultimate succession to owner of GIA[,]" and agreed to pay Griffin in monthly installments.  (Am. Compl. ¶ 13.)  Though he eventually became a partner of GIA,

Loyd received "only limited access to the business's financial records." (Am. Compl. ¶ 14.)

10. In 2012, "[Loyd], GIA, and Nationwide entered into a Corporate Associate Agent Agreement" pursuant to which Loyd and GIA agreed to exclusively sell "Nationwide business." (Am. Compl. ¶ 15.)

11. In 2018, Nationwide changed its agency ownership policies from a captive agent policy to independent agencies. (Am. Compl. ¶ 23.) With this development, Loyd asserts that "Griffin realized he could maintain his role as head of GIA and began a campaign to force [Loyd] out of the business and/or to significantly reduce [Loyd's] partnership interest." (Am. Compl. ¶ 23.) Loyd further alleges that he was "forced" to merge Loyd Insurance Agency with GIA, with GIA being the surviving corporation. (Am. Compl. ¶ 23.)

## C. **The Shareholders' Agreement**

12. Loyd alleges Griffin coerced him into signing a Shareholders' Agreement for GIA in or around 2018. (Am. Compl. ¶ 25.) Before the Shareholders' Agreement was presented to Loyd, he asserts that he owned "approximately seventy-two percent of the entire Nationwide book of business" and "produc[ed] the majority of the revenue[ ]" for GIA. (Am. Compl. ¶¶ 26, 28.) Nevertheless, the Shareholders' Agreement assigned 67.7% of GIA's ownership to Griffin and only 25.76% to Loyd. (Am. Compl. ¶ 28.) Loyd alleges "Griffin told [Loyd] it was '[Griffin's] way or no way.' " (Am. Compl. ¶ 25.) "If [Loyd] refused to sign the Shareholder's [*sic*] Agreement," Loyd alleges, "Griffin would have terminated [Loyd's] employment and/or taken [Loyd's]

book of business, based on Griffin's pattern and practice involving his other agents, employees, or partners." (Am. Compl. ¶ 25.) Loyd also alleges that, if he did not sign the Shareholders' Agreement, he would stand to "lose a considerable amount of money[.]" (Am. Compl. ¶ 76.)

### D. First Choice's Formation and Activities

13. In April 2015, Griffin started First Choice Insurance Brokers, LLC (n/k/a First Choice Agents Alliance, LLC ("First Choice")). (Am. Compl. ¶ 17.) Through First Choice, Griffin allegedly profited from "commercial policies sold through broker-dealers other than Nationwide." (Am. Compl. ¶ 18.) Griffin named his spouse and son, but not himself, as First Choice's original managing members. (Am. Compl. ¶ 18.) Loyd believes Griffin was not a member because of his "exclusivity and/or principal agent agreement" with Nationwide prior to Nationwide's 2018 policy change. (Am. Compl. ¶ 18.)

14. In violation of Loyd's exclusivity agreement with Nationwide, and although Loyd was not a member nor employee of First Choice, Griffin "urged [Loyd] to write and sell policies of insurance for First Choice[.]" (Am. Compl. ¶ 19.) Loyd also asserts Griffin consistently "instructed [Loyd] to switch customers from GIA and Nationwide to First Choice" from 2015 to 2020. (Am. Compl. ¶ 82.) Loyd alleges that he complied with these requests "[b]ased on the long-standing business relationship between he and Griffin and Griffin's past representations about leaving the business to [Loyd] one day[.]" (Am. Compl. ¶ 21.) As a result, Loyd claims that these activities decreased

Loyd's Nationwide book of business and indirectly benefited Griffin through his family. (Am. Compl. ¶ 82.)

15. In 2018, Griffin simultaneously "accus[ed] [Loyd] of neglecting his obligations to GIA[,] . . . [and] not producing sufficient Nationwide business[.]" (Am. Compl. ¶ 24.)

### E. Loyd's Termination for Issuing Certificates of Insurance

16. Loyd further alleges that in 2018 Griffin sought to sell GIA. (Am. Compl. ¶ 33.) In January and February of 2020, Defendants received offers to buy GIA, and based on these offers, Loyd asserts that he could have received more than five million dollars for his then-23% share in GIA. (Am. Compl. ¶¶ 34–35.) In March of 2020, however, Defendants "terminated [Loyd's] employment with GIA . . . for the sole purpose of increasing Griffin's . . . share of any purchase and acquisition of GIA." (Am. Compl. ¶ 36.)

17. Loyd alleges that, before Defendants ended Loyd's employment with GIA, GIA's Operations Manager, Jacqueline Sipe ("Sipe"), searched Loyd's email account "for 'evidence' [Defendants] could use to bolster [Loyd's] termination." (Am. Compl. ¶ 37.) Loyd claims that Sipe, "continuously sought to undermine him" and "berat[ed] him at employee meetings." (Am. Compl. ¶ 11.) Loyd also alleges that "Sipe worked closely with Defendant Griffin" and "maintained an improper personal relationship" with Griffin. (Am. Compl. ¶ 11.)

18. Sipe's search yielded certificates of insurance which Defendants contended Loyd improperly issued, notwithstanding the fact that Nationwide previously

approved Loyd's requests to issue some certificates of insurance for the convenience of certain Nationwide customers. (Am. Compl. ¶¶ 38, 45.)

19. Although Loyd admits to issuing other certificates of insurance "without first obtaining Nationwide's consent[,]" he further alleges that his issuing such certificates was a practice "authorized by Nationwide and not capable of causing any financial damage to Defendants or Nationwide." (Am. Compl. ¶¶ 46, 69.) Defendants, however, "claim[ ] [Loyd] had fraudulently issued or had instructed others at GIA to issue" the non-approved certificates of insurance. (Am. Compl. ¶ 38.)

20. Following Sipe's search of Loyd's email, Griffin notified Nationwide about Loyd's allegedly fraudulent certificates of insurance. (Am. Compl. ¶ 51.) Nationwide then terminated Loyd's employment, and "suspend[ed] [Loyd's] license to sell business through Nationwide[.]" (Am. Compl. ¶¶ 52, 95(f).)

21. Loyd alleges Defendants "viciously, maliciously, willfully and wantonly, forced [Loyd] out of the business . . . solely to increase their share" of the proceeds from selling the business and "used their influence and prestige with Nationwide to coerce and/or force Nationwide to destroy its relationship with [Loyd][.]" (Am. Compl. ¶ 95(e)–(f).) Defendants offered Loyd a severance agreement of $800,000 for Loyd's GIA stock, which Loyd did not accept. (Am. Compl. ¶¶ 53–54.)

## III.    PROCEDURAL BACKGROUND

22. The Court sets forth here only those portions of the procedural history relevant to its determination of the Motions.

23. Loyd initiated this action by filing his Complaint on 25 September 2020. (ECF No. 3.) The case was designated as a mandatory complex business case by Order of the Chief Justice of the Supreme Court of North Carolina, (ECF No. 1), and assigned to the undersigned on 26 October 2020, (Assign. Order, ECF No. 2).

24. On 11 January 2021, Loyd filed his Amended Complaint. (Am. Compl.)

25. On 29 January 2021, Defendants filed the Motion to Dismiss. (Mot. Dismiss.) The Motion to Dismiss has been fully briefed. (Defs.' Br. Supp. Mot. Dismiss, ECF No. 37, ["Br. Supp."]; Pl.'s Br. Opp'n Defs.' Mot. Dismiss, ECF No. 48, ["Br. Opp'n"]; Defs.' Reply Pl.'s Br. Opp'n Defs.' Mot. Dismiss, ECF No. 50, ["Reply Br."].)

26. On 29 January 2021, Defendants filed the Motion to Strike in response to Loyd's Amended Complaint. (Mot. Strike.) The Motion to Strike has been fully briefed. (Defs.' Br. Supp. Mot. Strike, ECF No. 39; Pl.'s Br. Opp'n Defs.' Mot. Strike, ECF No. 47; Defs.' Reply Pl.'s Br. Opp'n Defs.' Mot. Strike, ECF No. 49.)

27. On 29 January 2021, Defendants filed their Answer to Loyd's Amended Complaint. (ECF No. 40.)

28. On 22 April 2021, the Court held a hearing by video conference on the Motions. (*See* Not. Hearing, ECF No. 51.) The Motions are now ripe for resolution.

## IV. LEGAL STANDARD ON MOTION TO DISMISS

29. In ruling on a motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure (the "Rules"), the Court reviews the allegations in the Complaint in the light most favorable to Plaintiff. *See Christenbury Eye Ctr., P.A.*

*v. Medflow, Inc.*, 370 N.C. 1, 5 (2017). The Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory[.]" *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670 (1987). When making its determination, the Court accepts all well-pleaded factual allegations in the relevant pleading as true. *See Krawiec v. Manly*, 370 N.C. 602, 606 (2018). The Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. D.H.H.S. Div. of Facility Servs.*, 174 N.C. App. 266, 274 (2005) (quoting *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002)).

30. Our Supreme Court has noted that "[i]t is well established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.' " *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (quoting *Wood v. Guilford Cty.*, 355 N.C. 161, 166 (2002)). This standard of review for Rule 12(b)(6) is the standard our Supreme Court "routinely uses . . . in assessing the sufficiency of complaints in the context of complex commercial litigation." *Id.* at n.7.

## V.  ANALYSIS

### A.  Defendants' Motion to Dismiss Count II (Tortious Interference with Plaintiff's Business)

31.  Defendants first move to dismiss Count II of the Amended Complaint for Tortious Interference with Plaintiff's Business (the "Tortious Interference" claim).

32.  "A claim for tortious interference with 'business relations' embraces claims for interference with both existing contracts and prospective future contracts." *E-Ntech Indep. Testing Servs. v. Air Masters, Inc.*, 2017 NCBC LEXIS 2, at **14 (N.C. Super. Ct. Jan. 5, 2017) (citing *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 2002 NCBC LEXIS 2, at **29 (N.C. Super. Ct. July 10, 2002)).  Therefore, the Court will analyze Loyd's Tortious Interference claim as one for both tortious interference with contract and tortious interference with prospective economic advantage.

33.  To state a claim for tortious interference with contract, a claimant must allege the following: (1) a valid contract exists between the claimant and a third person; (2) the opponent knows of the contract between claimant and the third party; (3) the opponent intentionally induces the third person not to perform the contract with claimant; (4) the opponent in doing so acts without justification; and (5) the interference results in actual damage to claimant.  *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661 (1988) (citing *Childress v. Abeles*, 240 N.C. 667, 674 (1954)).

34.  The difference between a tortious interference with contract claim and a tortious interference with prospective economic advantage claim lies in the timing of the interference.  *Lunsford v. Viaone Servs., LLC*, 2020 NCBC LEXIS 111, at *13

(N.C. Super. Ct. Sept. 28, 2020). While a tortious interference with contract claim exists when the interference occurs after the contract is formed, a tortious interference with prospective economic advantage claim arises when someone "induces a third party 'not to enter a contract with' the [claimant] when the contract would have resulted 'but for the interference.' " *Id.* (quoting *Dalton v. Camp*, 353 N.C. 647, 654 (2001) (internal citations omitted)). "In either case, the interference is actionable only if done 'without justification.' " *Id.* (quoting *United Labs., Inc.*, 322 N.C. at 661).

35. Loyd alleges that Defendants tortiously interfered with Loyd's business relationship with Nationwide in two primary ways: (1) Defendants "wrongfully accus[ed] [Loyd] of issuing false certificates of insurance, a practice Defendants knew or should have known was authorized by Nationwide and not capable of causing any financial damage to Defendants or Nationwide," (Am. Compl. ¶ 69); and (2) Defendants "caused [Loyd] to breach his exclusivity agreement with Nationwide by compelling him to write new business for First Choice" and "compelling [him] to switch established Nationwide/GIA customers to policies written by First Choice for other insurance brokers," (Am. Compl. ¶ 71).

36. The first allegation, that Defendants wrongfully accused Loyd of issuing false certificates of insurance and that the accusations resulted in Nationwide terminating its relationship with him, cannot support a claim for tortious interference because Loyd also alleges, inconsistently, that Nationwide was aware and had previously authorized the practice. (Am. Compl. ¶ 69.)

37. Taking Loyd's allegation as true, Nationwide could not have been induced to terminate its relationship with Loyd if he engaged in conduct that Nationwide had already approved. As Defendants observed, such an allegation is not logical. (Br. Supp. 6.)

38. Thus, Defendants' accusation that Plaintiff was issuing false certificates of insurance could not have induced Nationwide to terminate its relationship with Plaintiff. *See Charah, LLC v. Sequoia Servs. LLC*, 2019 NCBC LEXIS 18, at *18 (N.C. Super. Ct. Mar. 11, 2019) ("induce" has been interpreted in the tortious interference context to mean "purposeful conduct, active persuasion, request, or petition"); *see also Inland Am. Winston Hotels, Inc. v. Crockett*, 212 N.C. App. 349, 354 (2011).

39. The second allegation, that Defendants caused Loyd to breach his exclusivity agreement with Nationwide, also fails to support a tortious interference claim because it does not allege the essential element that Defendants induced a third-party (Nationwide) to refrain from performing a contract with Loyd.

40. Here, Loyd claims that Defendants caused *Loyd* to breach the contract with Nationwide by compelling *Loyd* to do things inconsistent with the contract. (Am. Compl. ¶ 71.) This allegation fails to allege how Defendants induced a *third-party* (e.g. Nationwide) not to perform a contract with Loyd, as is required to successfully pursue a claim for tortious interference. *United Labs., Inc.*, 322 N.C. at 661. The second allegation in support of the Tortious Interference claim therefore also fails.

41. Moreover, "[a] motion to dismiss a claim of tortious interference is properly granted where the complaint shows the interference was justified[.]" *Pinewood Homes, Inc. v. Harris*, 184 N.C. App. 597, 605 (2007) (citing *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 220 (1988)). "The interference is 'without justification' if the defendants' motives . . . were 'not reasonably related to the protection of a legitimate business interest' of the defendant." *Privette v. Univ. of N.C.*, 96 N.C. App. 124, 134 (1989) (quoting *Smith v. Ford Motor Co.*, 289 N.C. 71, 94 (1976)). "Accordingly, . . . the complaint must admit of no motive for interference other than malice." *Id.* at 134–35; *see also Sides v. Duke Univ.*, 74 N.C. App. 331, 346 (1985).

42. The malice required to sustain a tortious interference claim is legal, not actual, malice. *Childress*, 240 N.C. at 675. Legal malice "denotes the intentional doing of the harmful act without legal justification." *Id.* "General allegations of malice are insufficient as a matter of pleading." *Pinewood Homes, Inc.*, 184 N.C. App. at 605. The Complaint must provide "a factual basis to support the claim of malice." *Id.*

43. No legal malice has been pleaded here. Defendants' decision to disclose to Nationwide that Plaintiff had issued allegedly false certificates of insurance was justified because it was reasonably related to the protection of Defendants' legitimate business interests.

44. Loyd alleges that Griffin was an agent of Nationwide, Griffin located certificates of insurance created by Loyd that Griffin claimed to be false, and Griffin therefore notified Nationwide about the existence of the certificates. (*See* Am Compl.

¶¶ 9, 39, 51.) This disclosure by Defendants to Nationwide about the certificates of insurance which Defendants claimed to be false, based on the allegations in the Amended Complaint, was reasonably related to the protection of Defendants' legitimate business interests and, on these allegations, no legal malice exists to support a tortious interference claim.

45.    The fact that Defendants may also have been motivated to report Plaintiff by other factors does not negate their justification for doing so. *Pinewood Homes, Inc.,* 184 N.C. App. at 605. Accordingly, the Motion to Dismiss is granted as to the claim for Tortious Interference with Plaintiff's Business.[4]

## B.    **Defendants' Motion to Dismiss Count III (Recission)**

46.    Defendants next move for dismissal of Count III of the Amended Complaint in which Plaintiff alleges that the 2018 Shareholders' Agreement between the parties signed by Loyd on 25 June 2018 should be rescinded on the basis of alleged coercion and undue duress. (Am. Compl. ¶ 78.)

47.    Loyd contends that Griffin engaged in wrongful conduct that forced Loyd to sign the document in question. (Am. Compl. ¶ 76.) Specifically, Griffin allegedly "expressly and/or impliedly t[old] [Loyd] he did not have a choice but to sign the Shareholder's Agreement as drafted if he wished to continue working with GIA [and that] it was [ ] [Griffin's] way or no way." (Am. Compl. ¶ 75.)

---

[4] Notwithstanding the Court's conclusions that this claim should be dismissed, "[t]he decision to dismiss an action with or without prejudice is in the discretion of the trial court." *First Fed. Bank v. Aldridge,* 230 N.C. App. 187, 191 (2013). The Court concludes, in the exercise of its discretion, that dismissal of the Tortious Interference claim should be without prejudice to Loyd's right to attempt to reassert such claim through proper factual allegations by way of a motion to amend.

48. Rescission is an equitable remedy that allows a wronged party to cancel a contract. *Wilson v. Wilson*, 261 N.C. 40, 43 (1964). True coercion or duress in the formation of a contract may support such a remedy. *See, e.g., Hinson v. Jefferson*, 24 N.C. App. 231, 237 (1974) ("[W]here a person has been induced to part with something of value for little or no consideration, equity will seize upon the slightest circumstance of fraud, duress, or mistake for the purpose of administering justice[.]"). Thus, where duress exists, rescission results in the "abrogation or undoing of [the contract] from the beginning." *Brannock v. Fletcher*, 271 N.C. 65, 74 (1967) (quoting *Dooley v. Stillson,* 46 R.I. 332, 335 (1928)).

49. "To adequately assert . . . duress, the claimant must demonstrate: (1) a wrongful act or threat; (2) that induces the claimant to make a contract; and (3) that deprives the claimant of his or her free will." *Paradigm Fin. Grp., Inc. v. Church*, 2014 NCBC LEXIS 15, at **15 (N.C. Super. Ct. May 7, 2014) (citing *Radford v. Keith*, 160 N.C. App. 41, 43–45 (2004) (internal citations omitted)).

50. Defendants seek dismissal of this claim on the basis that Loyd "failed to adequately plead the elements of duress, namely that Defendants ever made a wrongful act or threat toward him or that the circumstances otherwise deprived him of the exercise of his free will," in connection with signing the 2018 Shareholders' Agreement. (Br. Supp. 8.)

51. Citing *Housing, Inc. v. Weaver*, 37 N.C. App. 284 (1978), which relies on *Rose v. Vulcan Materials Co.*, 282 N.C. 643 (1973), Loyd argues that duress exists because "[b]y forcing [Loyd] to sign a Shareholder's Agreement, Defendants not only

breached their fiduciary duty to [Loyd], they also breached or threatened to breach the parties' prior agreements." (Br. Opp'n 13.) Plaintiff's arguments are unavailing.

52. First, Loyd fails to allege that Griffin was either majority shareholder in GIA or otherwise satisfies the factual prerequisites to create fiduciary duties owed to Loyd at the time of the alleged misconduct. *See, e.g., Corwin v. British Am. Tobacco PLC,* 371 N.C. 605, 616 (2018) ("[T]he majority stockholder of a corporation owes fiduciary duties to the minority stockholders." (citing *Gaines v. Long Mfg. Co.,* 234 N.C. 340, 344 (1951))); *see also Beam v. Sunset Fin. Servs.*, 2019 NCBC LEXIS 56, at **9–10 (N.C. Super. Ct. Sept. 3, 2019) ("[t]he standard for finding a *de facto* fiduciary relationship is a demanding one: 'only when one party figuratively holds all the cards . . . have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen." (quoting *Lockerman v. S. River Elec. Membership Corp.*, 250 N.C. App. 631, 636 (2016))). The *de facto* fiduciary standard is a demanding one to meet, and Plaintiff's allegations fall well-short of the mark. In fact, Loyd claims, among other things, that his own team at GIA "had been producing the majority of the revenue." (Am. Compl. ¶ 28.)

53. Notwithstanding his pleading failures regarding the existence of fiduciary duties, Loyd may still survive dismissal of the rescission claim under Rule 12(b)(6) if he alleges that Griffin threatened a breach of contract that would "destroy [Loyd's] business where [Griffin's] power did not come to him as a result of the contract." *Housing,* 37 N.C. App. at 299 (citing *Rose*, 282 N.C. at 666). "A threatened violation of a contractual duty ordinarily is not in itself coercive, but if failure to receive the

promised performance will result in irreparable injury to business, the threat may involve duress." *Rose,* 282 N.C. at 665 (finding that the plaintiff in that case yielded due to economic duress caused by defendant's threatened and actual breach of contract, which was coercive, and where the defendant's economic power was not derived from the contract itself) (internal citations omitted).

54. However, the allegations here are unlike the facts of either *Housing* or *Rose*. In *Housing,* the external source of power was the government threatening to cancel the project unless construction began, and in *Rose,* the external source of the power was that the defendant was the sole supplier of stone in the area; in neither case was the sole source of power the contract that the wrongdoer was threatening to breach. *Housing,* 37 N.C. App. at 297–98.

55. In this case the Amended Complaint does not contain allegations regarding an external source of power that, combined with Plaintiff's threatened breach, gave Griffin means to exert duress over Loyd. The Court concludes that Loyd has not satisfied the pleading requirements under *Rose* and *Housing* and thus his rescission claim must be dismissed. *George Shinn Sports, Inc. v. Bahakel Sports, Inc.,* 99 N.C. App. 481, 487 (1990) ("a mere breach or threat of breach of contract, *without more*, is insufficient to establish a claim or defense of duress.") (emphasis added); *see also Rose*, 282 N.C. at 665.

56. Therefore, the Motion to Dismiss is granted as to the claim for recission and that claim is dismissed without prejudice.

## C. Defendants' Motion to Dismiss Count IV (Unjust Enrichment)

57. Defendants next move for dismissal of Count IV of the Amended Complaint, Plaintiff's claim for unjust enrichment.

58. "A claim for unjust enrichment 'is neither in tort nor contract but is described as a claim in quasi contract or a contract implied in law.' " *Cty. of Wake PDF Elec. & Supply Co., LLC v. Jacobsen*, 2020 NCBC LEXIS 103, at *28 (N.C. Super. Ct. Sept. 9, 2020) (quoting *Booe v. Shadrick*, 322 N.C. 567, 570 (1988)).

59. "The general rule of unjust enrichment is that where services are rendered and expenditures made by one party to or for the benefit of another, without an express contract to pay, the law will imply a promise to pay a fair compensation therefor." *Atlantic C. L. R. Co. v. State Highway Comm'n*, 268 N.C. 92, 95–96 (1966) (citing *Beacon Homes, Inc. v. Holt*, 266 N.C. 467 (1966), and *Dean v. Mattox*, 250 N.C. 246 (1959)). "The claim is not based on a promise but is imposed by law to prevent an unjust enrichment. If there is a contract between the parties [then] the contract governs the claim and the law will not imply a contract." *Booe*, 322 N.C. at 570.

60. "In North Carolina, to recover on a claim of unjust enrichment, Plaintiff must prove: (1) that it conferred a benefit on another party; (2) that the other party consciously accepted the benefit; and (3) that the benefit was not conferred gratuitously or by an interference in the affairs of the other party." *Cty. of Wake PDF Elec. & Supply Co., LLC*, 2020 NCBC LEXIS 103, at *29 (citing *Southeastern Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330 (2002)).

61. Loyd alleges that, "[a]t all times relevant to this litigation, Defendants [ ] owed a legal duty to [Loyd] to not unfairly and unduly take advantage of [him] or commit wrongful acts to unjustly enrich themselves at [his] expense or at the expense of [his] property or financial interests[,]" (Am. Compl. ¶ 80), but that "from approximately 2015 to the present, Defendants [ ] unjustly enriched themselves by wrongfully converting, taking, utilizing or managing property and financial interests of [ ] [Loyd][,]" (¶ 81).

62. Specifically, Loyd alleges that, "from 2015 to 2020, [ ] Griffin continuously compelled [Loyd] to write business for First Choice and instructed [Loyd] to switch customers from GIA and Nationwide to First Choice, [ ] decreasing GIA and [Loyd's] book of business with Nationwide, and increasing First Choice's book of business, [ ] financially benefit[ing] [ ] Griffin." (Am. Compl. ¶ 82.) Loyd alleges that during the relevant time period, Griffin's wife served as the CEO for First Choice and that Griffin's wife and son were two of the owners of First Choice, and therefore Griffin profited, at least indirectly, from the profits received by First Choice. (Am. Compl. ¶ 82.) Loyd concludes that Griffin has been unjustly enriched as a result. (Am. Compl. ¶ 81.)

63. Defendants make three arguments for the dismissal of the unjust enrichment claim: (1) Loyd has failed to establish that a benefit was conferred to Griffin and/or GIA; (2) Loyd's claim is time-barred by the applicable statute of limitations; and (3) the equitable doctrine of unclean hands bars Loyd's claim. (Br. Supp. 11–15.)

64.     As to the first argument, that Loyd has failed to establish that a benefit was conferred to Griffin and/or GIA, Loyd has alleged enough in the Amended Complaint to survive this challenge. Loyd alleges that, following First Choice's creation, he began to generate business for First Choice and that, because Griffin's wife and son hold officer and ownership positions within First Choice, Griffin has "profited either directly and/or indirectly from profits received by First Choice." (Am. Compl. ¶ 82.)

65.     Defendants treat this allegation as conclusory and argue that the Court should not accept this allegation as true for the purpose of testing the sufficiency of the Amended Complaint. (Br. Supp. 12–13 n.3.) The Court disagrees. Paragraph 82 of the Amended Complaint is not merely a conclusory assertion that Griffin profited from First Choice, given that Defendants alleged Griffin's close familial relationship with First Choice's officers and owners, and given the allegation that Griffin was the one who "created" First Choice. (Am. Compl. ¶ 17–18.)

66.     Further, as Defendants note, (Br. Supp. 12–13 n.3), an indirect benefit can properly support a claim for unjust enrichment. *See Lau v. Constable*, 2017 NCBC LEXIS 10, at *14 (N.C. Super. Ct. Feb. 7, 2017). Therefore, Defendants' first argument for dismissal of the unjust enrichment claim fails.

67.     As to the argument that Loyd's claim is time-barred, it is not clear to the Court from the face of the Amended Complaint that the unjust enrichment claim is barred by the applicable three-year statute of limitations. N.C.G.S. § 1-52. Loyd alleges that "from 2015 to 2020, [ ] Griffin *continuously* compelled [Loyd] to write

business for First Choice and instructed him to switch customers from GIA and Nationwide to First Choice, thereby decreasing GIA and [Loyd's] book of business with Nationwide, and increasing First Choice's book of business, which financially benefited [ ] Griffin." (Am. Compl. ¶ 82, emphasis added.)

68.     At least some of the alleged wrongful conduct is claimed to have occurred within three years of the filing of this action.   Further, "[t]he continuing wrong doctrine is an exception to the general rule that a cause of action accrues as soon as the plaintiff has the right to sue." *Stratton v. Royal Bank of Can.,* 211 N.C. App. 78, 86 (2011) (citing *Williams v. Blue Cross Blue Shield of N.C.,* 357 N.C. 170, 179 (2003)). "Under the continuing wrong doctrine, the statute of limitations does not start running 'until the violative act ceases.' " *Marzec v. Nye,* 203 N.C. App. 88, 94 (2011) (quoting *Babb v. Graham*, 190 N.C. App. 463, 481 (2008) (cleaned up)).   "[I]n order for the continuing wrong doctrine to toll the statute of limitations, the plaintiff must show '[a] continuing violation' by the defendant that 'is occasioned by continual unlawful acts, not by continual ill effects from an original violation.' " *Stratton,* 211 N.C. App. at 86 (quoting *Marzec,* 203 N.C. App. at 94 (cleaned up)).

69.     Because Loyd claims that Griffin continued to wrongfully compel Loyd to write business for First Choice and to switch customers from GIA to First Choice, constituting unjust enrichment, until the year that the Complaint was filed, the continuing wrong doctrine allows this case to go forward at the motion to dismiss stage.

70.     As to the third argument, unclean hands, it would be improper at this stage of the litigation to determine that this affirmative defense has been established to bar Loyd from pursuing his claim for equitable relief.  Indeed, none of the caselaw cited by Defendants in support of their third argument for dismissal of the unjust enrichment claim, based on Loyd's alleged unclean hands, was decided in the Rule 12(b)(6) motion to dismiss context.  (Br. Supp. 14.)

71.     The doctrine of unclean hands is fact dependent and generally left for the trier of fact to decide.  *Ferguson v. Ferguson*, 55 N.C. App. 341, 347 (1982) ("Whether plaintiff committed an unconscionable act and whether her actions were more egregious than those of defendants, are questions of material fact to be decided by a jury and not by the court." (citing *High v. Parks*, 42 N.C. App. 707 (1979))); *see also Shaw v. Gee*, 2018 NCBC LEXIS 109, at *18 (N.C. Super. Ct. Oct. 19, 2018) (referring to the issue as a "classic jury question"), *and Southeast Anesthesiology Consultants v. Charlotte-Mecklenburg Hosp. Auth.*, 2018 NCBC LEXIS 137, at *78–80 (N.C. Super. Ct. June 22, 2018).

72.     For the reasons stated above, the Motion to Dismiss with respect to the unjust enrichment claim is denied.

### D.     Defendants' Motion to Dismiss Count VI (Punitive Damages)

73.     Finally, Defendants seek to dismiss Count VI of the Amended Complaint for punitive damages.

74.     A claim for punitive damages is not a stand-alone cause of action.  *Aldridge v. Metro. Life Ins. Co.*, 2019 NCBC LEXIS 116, at *146 (N.C. Super. Ct. Dec. 31, 2019)

("North Carolina courts have repeatedly held that 'a claim for punitive damages is not a stand-alone claim.' " (quoting *Funderburk v. JPMorgan Chase Bank, N.A.*, 241 N.C. App. 415, 425 (2015))); *see also Thompson v. Bank of Am., N.A.*, 242 N.C. App. 523, 2015 N.C. App. LEXIS 660, at \*12 (2015), *Collier v. Bryant*, 216 N.C. App. 419, 434 (2011), *and Iadanza v. Harper*, 169 N.C. App. 776, 783 (2006).

75. While the purported claim is defective for this reason alone, Defendants move to dismiss it on the additional basis that Loyd has made only conclusory allegations to support punitive damages. (Br. Supp. 15–17.) The Court disagrees that the allegations are conclusory.

76. "Punitive damages may be awarded only if the claimant proves that the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded: (1) [f]raud[;] (2) [m]alice[;] [and/or] (3) [w]illful or wanton conduct." N.C.G.S. § 1D-15(a). "A demand for punitive damages shall be specifically stated, except for the amount, and the aggravating factor that supports the award of punitive damages shall be averred with particularity." N.C.G.S. § 1A-1, Rule 9(k).

77. Paragraphs 94 and 95 of the Amended Complaint contain a litany of allegations that may support Loyd's contention that Defendants committed "willful and wanton" acts and acted maliciously. Some of the allegations that may support Loyd's contention of malice or willful and wanton acts, if proven, are: "[w]hen faced with the possible lucrative sale of the business, Defendants intentionally and with improper purpose terminated [Loyd's] employment so that he would not benefit from

the sales proceeds"; Defendants allegedly "den[ied] [Loyd] full reconciliation of the partnership financial records and books"; Griffin allegedly "threaten[ed] legal action if Plaintiff did not execute a severance agreement, the terms of which were unconscionable"; among other allegations. (Am. Compl. ¶¶ 94–95.)

78. Thus, the Court concludes that, while the Motion to Dismiss Loyd's punitive damages claim should be granted, it is without prejudice to Loyd's later ability, upon proper proof, to seek an award of punitive damages at trial.[5]

### E. Defendants' Motion to Strike

79. By separate motion, Defendants request that the Court strike an allegation in paragraph 11 of the Amended Complaint, pursuant to Rule 12(f). Defendants argue that the allegation made in the last sentence of paragraph 11, namely that Griffin and Sipe maintained an "improper personal relationship," is irrelevant to the business dispute between the parties and should thus be stricken. (Br. Supp. 2–3.)

80. Pursuant to Rule 12(f), a trial court "may order stricken from any pleading any insufficient defense or any redundant, irrelevant, immaterial, impertinent, or scandalous matter." N.C.G.S. § 1A-1, 12(f). Whether to grant or deny a motion to strike under Rule 12(f) is within the trial court's sound discretion. *Reese v. City of Charlotte*, 196 N.C. App. 557, 567 (2009) (citing *Carpenter v. Carpenter*, 189 N.C. App. 755, 759 (2008) (internal citations omitted)).

---

[5] While not necessary to its determination here, the Court notes that Defendants did not move to dismiss Count I of the Amended Complaint for breach of fiduciary duty, (*see* Am. Compl. and Mot. Dismiss), and "our courts have allowed punitive damages stemming from proof of a breach of fiduciary duty." *Beam,* 2019 NCBC LEXIS 56, at **59; *see also Lacey v. Kirk*, 238 N.C. App. 376, 394 (2014). Therefore, a claim remains against Defendants which may warrant punitive damages.

81. "Rule 12(f) motions are 'viewed with disfavor and are infrequently granted.'" *Daily v. Mann Media, Inc.*, 95 N.C. App. 746, 748–49 (1989) (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1380 (1969)). "Matter should not be stricken unless it has no possible bearing upon the litigation." *Haddock v. Volunteers of Am., Inc.*, 2021 NCBC LEXIS 8, at *8 (N.C. Super. Ct. Jan. 22, 2021) (quoting *Shellhorn v. Brad Ragan, Inc.*, 38 N.C. App. 310, 316 (1978)); *see also Bochkis v. Med. Justice Servs., Inc.*, 2016 NCBC LEXIS 90, at *17 (N.C. Super. Ct. Nov. 23, 2016) (declining to strike an allegation where it was not clear to the Court whether the allegation would have any bearing upon the litigation).

82. It is unclear to the Court at this stage of the proceeding whether an allegation by Loyd that Griffin and Sipe shared an "improper personal relationship" is irrelevant to the other matters involved in this suit.

83. Therefore, the Court, in the exercise of its discretion, denies Defendant's Motion to Strike on this basis.

## VI.    CONCLUSION

84. For the foregoing reasons, the Court hereby **GRANTS IN PART** and **DENIES IN PART** the Defendants' Motions as follows:

a. the Motion to Dismiss the second claim for relief for tortious interference is hereby GRANTED and that claim is DISMISSED without prejudice;

b. the Motion to Dismiss the third claim for relief for recission is hereby GRANTED and that claim is DISMISSED without prejudice;

c. the Motion to Dismiss the fourth claim for relief for unjust enrichment is hereby DENIED;

d. the Motion to Dismiss the seventh claim for relief for punitive damages is hereby GRANTED without prejudice to Loyd's ability to pursue such damages upon proper proof; and

e. the Motion to Strike is DENIED.

**SO ORDERED**, this the 10th day of December, 2021.

/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
 for Complex Business Cases